Richard HAUSER and Leonard LeTendre, on behalf of themselves and all similarly situated, Plaintiffs,

v.

FARWELL, OZMUN, KIRK & COMPANY, Defendant.

LOCAL 970, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA; Earl Drange; Donald F. Liljedahl, Defendants and Third-Party Plaintiffs,

v.

Martin UNGER, Silas M. Dahlin and Stanley Cunningham, Third-Party Defendants.

No. 3–66 Civ. 355.

United States District Court
D. Minnesota,
Third Division.

May 7, 1969.

Sax & Dove, by Paul D. Dove, St. Paul, Minn., for plaintiffs.

A. Patrick Leighton, Moore, Costello & Hart, St. Paul, Minn., appeared for defendant Farwell, Ozmun, Kirk & Co.

Lindquist, Magnuson & Glennon, by William C. Mortenson, Minneapolis, Minn., for defendants.

There was no appearance for third-party defendants.

## MEMORANDUM DECISION

NEVILLE, District Judge.

This is a class action instituted on behalf of 37 former employees of the Metal Fabricating Division of defendant Farwell, Ozmun, Kirk & Company (FOK) against that company and against Local 970 of the Teamsters Union (Union) and two of its individual officials. The dispute arises first over who is entitled to the cash proceeds of a non-contributory pension fund remaining upon the cessation of business by FOK's Metal Fabricating Division and the expiration of a collective bargaining agreement and second over whether, despite the cessation of business by such Division, FOK remains obligated to make future contributions to such pension fund for the benefit of plaintiffs. The principal defenses apart from an attack upon the court's jurisdiction for failure of plaintiffs to exhaust administrative remedies, are first that on cessation of business FOK and the Union mutually agreed in writing in such a manner as to bind all plaintiffs to a disposition of the cash remaining in the pension fund by providing pensions for those former employees between the ages of 62 and 65 (3 in number) thereby more than exhausting the fund and second, that on cessation of business and the termination of the collective bargaining agreement with the Union FOK's obliga-

tion to contribute further to the pension fund automatically ceased. Plaintiffs have joined the Union and two of its officials as defendants claiming that by entering into the agreement aforesaid, the Union failed fairly to represent the plaintiffs and discriminated against them as Union members. The Union has brought in as third party defendants the three persons who were between the ages of 62 and 65 and who received the benefit of the cash balance remaining in the pension fund by the agreement providing pensions for them. None of them has responded or answered and all three are in default in this action.

■ This court has subject matter jurisdiction of this controversy under 29 U.S.C. § 185[1] inasmuch as there is here involved an alleged contract violation between an employer and a labor organization. Jurisdiction inheres even though the suit is brought by individual members of a labor organization rather than by the Union itself to enforce personal rights if such are embodied in the collective bargaining agreement.[2]

At least a brief statement of facts is necessary to an understanding of the controversy. The collective bargaining agreement between FOK and the Union in force at the time of cessation of business of the Metal Fabricating Division in 1966 was dated January 31, 1963 and provided for the creation of a Pension Plan, superseding a prior 1958 plan, to be duly qualified under Treasury Department Regulations. The plan required no contributions by the employees, and provided "normal retirement" at age 65 with a minimum of ten years of employment prior thereto as eligibility for a pension. A monthly pension of $2.00 for each year of prior employment was specified. The plan provided as to financial contributions:

"On a quarterly basis, the Company shall make such contributions as are actuarially necessary to fund current and *past service credits*. Said contributions shall be limited to straight-time hours worked. *Past service credits shall be* funded over a period of not less than twenty years, nor more than forty-five years." [Emphasis added]

The plan, though embodied in an agreement dated January 1, 1963 obviously contemplated that all employees who became 65 after that date could count their service for all prior years—not just from 1963 on. This caused the reference to "past service credits" above.

The 1963 Collective Bargaining Agreement clearly envisioned another written document, i. e., a pension agreement since it provided:

" * * * said new pension plan * * shall be drafted as rapidly as possible but in any case no later than June 30, 1963."[3]

---

1. 29 U.S.C. § 185

    "(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

    (b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not* be enforceable against any individual member or his assets."

2. Smith v. Evening News Ass'n, 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

3. Sometime after June 30, 1963 each of the plaintiffs received a written notice of the pension contract, which provided inter alia:

    "All benefits are subject in every respect to the group deposit administration contract which alone constitutes the agreement under which payments are made. The group deposit administration contract may be amended, cancelled, or discontinued at any time by

No provision appears in the collective bargaining agreement for any "early" or prior-to-age-65 retirement. The collective bargaining agreement was duly ratified by the Union membership. In due course, FOK entered into a "Group Deposit Administration Contract" with Minnesota Mutual Life Insurance Company. This provided, inter alia, normal retirement date at age 65, a monthly annuity of $2.00, multiplied by the number of full years of service, and that (Sec. 5):

"A participant, upon termination of employment prior to Normal Retirement Date shall forfeit all rights to any benefits under this contract."

Section 6 provided:

"There are no early retirement benefits under this contract."

No reference appears in the collective bargaining agreement of January 1, 1963 concerning what should happen in the event the entire contract (and not the employment of one or more individuals) became terminated. The Group Deposit Administration Contract did, however, contemplate the possibility of the cessation of contributions by FOK and provided:

"12.02 * * *

A. After the effective date of termination of contributions, no further employees shall become participants, and no further contributions shall be payable.

*    *    *    *    *    *

C. In the absence of a request by the Employers * * * 'the Deposit Fund shall be applied to provide the following annuities, *which are fully vested* in each participant: [Emphasis added]

agreement between the Insurer and the Employer without the consent of or notice to the Employee or beneficiary.
The group deposit administration contract may be examined at the principal office of the Employer during regular office hours of the Employer."
None of the plaintiffs ever raised any objection to the terms or conditions of the contract.

1. A Normal Retirement Annuity commencing immediately for each participant in a deferred status in an amount sufficient to provide the income to which he is entitled, or, if the Deposit Fund is not sufficient, such uniform percentage of that amount as the Deposit Fund shall be sufficient to provide.

2. *    *    *[4]

3. Any funds remaining shall be apportioned among the participants not included in (1) * * * above, in the ratio that such participants' accrued annuity credits bear to the total accrued annuity credits for these remaining participants and applied to provide a Paid-up Deferred Annuity."

It appears from the above that on termination of contributions pensions for those then aged 65 would first be provided, and then, were a surplus to remain, a paid up deferred annuity under paragraph C. 3. would be provided for every other employee who had any accrued annuity credits, i. e., who had been an employee for a period of a year or more. Though the 37 plaintiffs in this class action are all persons with ten years or more of service, it seems clear that this period of service is immaterial under paragraph C. 3. (except to the extent of course that each year of service counts for any employee in determining the amount of pension he will receive).

It is stipulated that after providing for two persons who had reached age 65 and were thus eligible under 12.02 C. 1. above, and concerning whom there is no dispute in this lawsuit, there remained in the pension fund $11,897.12. It appears from stipulated facts that were this

4. Paragraph C. 2. is apparently a stock insertion into the agreement, but would affect only employees who retired early and since paragraph 6 indicated there were no early retirement benefits. Paragraph C. 2. is inapposite and of no effect (absent validity of the amendment agreement).

amount of $11,897.12 pro rated among the plaintiffs and other employees, not plaintiffs in this lawsuit, pursuant to paragraph C. 3. above, plaintiffs would receive at age 65 amounts varying from $1.09 to $4.53 per month. Many of course would wait years before receiving anything and normally some would be deceased prior to reaching that age. The latter figure represents the highest any would receive and the average payment would approximate $2.70 per month.[5]

The case would end here, and judgment would be entered in accordance with paragraph C. 3. above were it not for a claimed written agreement executed subsequent to the announcement of the closing down of the Metal Fabricating Division of FOK. By this agreement the Union and FOK covenanted to use the $11,897.12 plus an additional amount of $1,771.18 which FOK agreed to contribute to provide what have been referred to as meaningful pensions to three former employees (third party defendants herein) who were 62 years of age and over but who had not yet reached 65. This modification, if valid, brings into prominence paragraph 12.02 C. 2., relating to early retirement. The application of the funds in this manner left none to be applied under C. 3. above and if this agreement is to stand the 37 plaintiffs in this case have received and will receive nothing. If this subsequent agreement is valid and enforceable, then plaintiffs have no legal grievance. Whether it is valid and enforceable depends upon whether the Union had the power and the authority to represent and act for these plaintiffs, a substantial part of its membership in executing the same.

The fact of FOK's determination to close down its Metal Fabricating Division was communicated to the Union's Secretary-Treasurer prior to the end of March, 1966. A Union meeting was held April 2nd. The subsequent agreement is dated May 3, 1966 and is in the form of a Consent to a modification of the FOK Group Deposit Contract with Minnesota Mutual Insurance Company, signed by the President and the Secretary-Treasurer of the Union.[6] May 16, 1966 the Group Deposit Contract was modified accordingly by FOK and the Insurance Company. Both these documents provided an amendment of Sections 5 and 6 of the original Group Deposit Contract (above quoted) so as to permit early retirement at age 62 with the consent of FOK and so as to provide for those "62 but less than 65" 90% of the normal annuity one would receive were he not to retire until he had reached age 65.

The April 2, 1966 meeting of the members of Local 970 was held to announce to the employees that the Metal Fabricating Division was closing down and to discuss the phasing out of operations. At some point during the meeting, one of the employees apparently asked about pension rights for those aged 62 to 65. During this meeting there was no discussion of the subject of pensions for anyone other than those employees aged 62 to 65. None of the plaintiffs asked any questions or made any comments or objections concerning pensions for them and no mention was made of the effect of providing early retirement pensions for those aged 62 to 65.

Subsequent negotiations and meetings were had between representatives of the Union, including one of the named plain-

5. Counsel have submitted various actuarial schedules. The figures quoted above are the ones plaintiff has submitted and defendant contends should apply, if any. Plaintiffs' schedules would show a low of $1.85, a high of $7.69, and an average of approximately $4.60, limited to the plaintiffs and excluding other employees. The court does not believe under paragraph C. 3. other employees can be excluded.

6. According to the stipulation of facts a copy of this Consent was distributed to all "affected" employees. So far as the record shows, none objected to providing a pension for the three employees ages 62 to 65.

tiffs herein, Leonard LeTendre and FOK's personnel.

Shortly after June 1966, the available pension funds plus the additional amount then contributed by FOK were disbursed in accordance with the Group Deposit Contract, as amended, and three single premium annuities or the equivalent thereof were purchased from Minnesota Mutual Insurance Company for cash and the certificates or policies evidencing such delivered to the three former employees, who had attained age 62 but were younger than 65 (third party defendants herein).

Sometime after all of the above had transpired, Union officers were approached about pension rights for those members of the Union who had not reached age 62 but had had 10 years or more of employment service, i. e., the plaintiffs herein. Plaintiffs were advised that no further pension money existed and hence the Union could not and would not press any claims on their part. A similar response was made by FOK's Industrial Relations Director some time after the Metal Fabricating Division had closed down. No other attempt was made by plaintiffs to seek a remedy in the manner provided in the collective bargaining agreement.

■ The first defense asserted is that the court lacks jurisdiction to decide the controversy inasmuch as plaintiffs did not exhaust their contract remedies under Article VIII of the collective bargaining agreement then in force. The court agrees with plaintiffs that they did attempt to seek their contractual remedy, albeit not according to the specific procedures of the collective bargaining contract. Also it is clear that formal submission to the grievance procedure was not feasible in light of the community of interest between the employer and the Union. Some of the plaintiffs did in fact make inquiry and demands of defendants and were told "there is nothing that can be done" or "there is no pension." Further the actual amendment did not take place in the Group Deposit Contract until May 16, 1966 and by thirty days thereafter, the time for submission of written grievances under the collective bargaining contract, the Metal Fabricating Division had been closed down and the collective bargaining contract containing grievance procedures had become defunct. Under these facts the exhaustion requirement was met as far as was practicable. Nothing more is required. See Vaca v. Sipes, 386 U.S. 171, 184–186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Republic Steel Corp. v. Maddox, 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); International Longshoremen's & Warehousemen's Union v. Kuntz, 334 F.2d 165, 168 (9th Cir. 1964).

Plaintiffs' major contention is that at the time of the closing of the Metal Fabricating Division, they had "vested" rights to participation in the FOK pension plan and that FOK and/or the Union were powerless to divest them of those rights. Since the Union and FOK amended the pension agreement so as to exhaust the pension funds, they must be held liable if at all as converters for the amount of the fund in existence prior to the abortive amendment.

■ Two propositions are clear. First, plaintiffs make no claim that the defendants, themselves, have directly benefited from the denial to plaintiffs of their pension benefits. Hence there is no unjust enrichment to them. Second, there is no evidence of bad faith or deliberate intent to discriminate on the part of either FOK or the Union in amending the collective bargaining agreement. Since there is no claim of hostile discrimination by the Union, the mere fact that certain members are adversely affected normally would not render invalid a Union decision. Green v. Los Angeles Stereotypers Union No. 58, 356 F.2d 473 (9th Cir. 1966). The question becomes whether or not the matter of pension rights was one that the Company and Union together could affect and had the power to settle without direct indi-

vidual employee participation and consent.

It is true that had the Collecive Bargaining Agreement and the Group Deposit Contract been on-going and not terminated, the interest of plaintiffs under the pension plan would be limited to their contingent right to receive a pension at age sixty-five (65) (sixty-two (62) under the claimed amendment) if they were then still in the employ of FOK. A different situation appears, however, because the division of FOK no longer exists and because the collective bargaining agreement from which their rights emanate or might have emanated is at an end. The clear provision of Section 12.02 refers to rights "which áre fully vested."

There is little question in the court's mind but that if no amendment had been attempted or effected, the pension plan would have been deemed terminated and under Section 12.02 C. 3. above quoted, the rights of all employees would have become vested, each to his share of $11,-897.12. It is not entirely clear whether the "termination of contributions" preceded the attempted amendment or whether the amendment preceded the termination. The stipulated facts submitted by the parties does not indicate when the last contribution was made under the Group Deposit Contract. The only thing that appears in the stipulation of facts relative to this is the following:

> "Following the first of June 1966 the plant closed down, the Collective Bargaining Agreement between the Metal Fabricating Division and Local 970 terminated, effective date of contributions to the pension plan in question occurred and, accordingly, the pension plan terminated."

Construed literally this would mean that the written amendment to the Group Deposit Contract embodying the pension plan occurred two weeks or more before the "effective date of termination of contributions". Chronologically however the decision to shut down the Metal Fabricating Division had been made and communicated to the Union by the end of March 1966 and on April 2, 1966 a general meeting was held following notice by the Union to all employees. It must have been perfectly clear to anyone at that time that the pension plan was to cease with the concomitant vesting of rights under paragraph 12.02 C. 3. in all the employees. The question is whether, being aware of this, the Union and the Company technically could anticipate the vesting date by two or three weeks by a written amendment and thereby negate Section 12.02 C. 3. The court is of the view that this could not be done without the individual consent of all of the employees.

The court feels bound by the case of Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) which stands for the proposition that a Union has no authority on behalf of its membership to bargain away vested or accrued rights. This case was re-heard and a new opinion issued, see Elgin, J. & E. Ry. Co. v. Burley, 327 U.S. 661, 66 S. Ct. 721, 90 L.Ed. 928 (1946). Despite the accusations of Mr. Justice Frankfurter in his dissent that the court adhered to its original opinion "by extracting from it almost all of its vitality," this court still reads the two opinions as standing for the proposition that whereas a Union may bargain as to prospective matters such as seniority rights, future conditions of employment, etc., it cannot bargain away the accrued or vested rights of its members. So without explicit authority or a power of attorney from the individual members, the Union in this case could not bargain away the vested rights of its membership, including plaintiffs' vested rights. Because they deal with seniority and other such rights, cases cited by defendants are inapposite, such as Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); International Longshoremen's & Warehousemen's Union v. Kuntz, 334

F.2d 165 (9th Cir. 1964); Oddie v. Ross Gear & Tool Co., 305 F.2d 143 (6th Cir. 1962).

It is true of course that, as stated in the second *Elgin* case:

"We did not rule, and there is no basis for assuming we did, that an employee can stand by with knowledge or notice of what is going on with reference to his claim, either between the carrier and the union on the property * * * allow matters to be thrashed out to a conclusion by one method or the other, and then come in for the first time to assert his individual rights. No such ruling was necessary for their preservation and none was intended." 327 U.S. at 666–667, 66 S.Ct. at 723.

In this case there was some testimony (by stipulated facts) that at a meeting of employees no one objected to the suggestion made that those between the ages of 62 and 65 be permitted to absorb the remaining fund by having pensions created for them. It is clear, however, that no one explained or attempted to explain to any of the employees the effect that this would have on any claims they might have and this court does not regard that these plaintiffs so conducted themselves as to fall within the ambit of the language quoted above from the second *Elgin* case. This was bound to be a disturbed time for plaintiffs as discharged employees with thoughts devoted to new employment, lack of future salary and a host of other immediate concerns. It is a fair inference that future pension rights were not foremost in the minds of plaintiffs.

The parties themselves seem to have recognized the doctrine of "vested" rights, for in their Collective Bargaining Agreement of January 1, 1963, in dealing with the prior 1958 pension plan they provided:

"Upon its establishment the said new pension plan shall supersede any and all formal and/or informal pension plans or arrangements which heretofore have existed, and the Union shall cause to be delivered for itself and by and on behalf of each employee covered by such pension plan, a waiver of any and all rights which may have existed under any prior pension plan or arrangement." [7]

The pre-existing 1958 pension plan was not of course originally a Union negotiated plan, but it is obvious that the above language contemplated individual waivers so as not to run afoul of the rule prohibiting the Union from attempting to bargain away individual accrued or vested rights.

The court has been cited by defendants to Schneider v. McKesson & Robbins, Inc., 254 F.2d 827 (2nd Cir. 1958), where the court held that a discharged group of employees who had not attained the age of 60 had no rights under a pension plan which was financed entirely by employer contributions. The court held that a group of 88 employees constituting 1.6% of the total number of employees who had not attained age 65 at the time they were discharged could not claim an interest in the fund. They had at most an expectancy. This case did not involve any attempted amendment negotiated between the company and the Union. Interesting, however, is the language:

"The interest of participants under the plan and the trust fund is limited to their contingent rights to receive a pension at age 65 *and to their rights to share in the trust fund if the plan is terminated.* Since the appellants are not entitled to a pension either

---

7. Cases are correctly cited by FOK that an employer may not bypass the Union representatives and attempt to deal directly with employees lest it be guilty of an unfair labor practice. No reason appears, however, why the same technique could not have been used by FOK and the Union as in the above quoted provision of the 1963 collective bargaining agreement and thus avoid running afoul of the proscription.

presently or in the future, they can establish an interest in the pension fund *only if the plan has been terminated."* [Emphasis added]

In the case at bar there is no question but what the plan is terminated. The only question it seems to the court is whether an amendment made in the shadow of the termination date, if in fact "termination of contributions" did not earlier occur, can be said to have deprived the employees of what was about to become their vested rights when the individuals did not consent thereto nor, as the court finds, did not so conduct themselves as to be estopped from challenging what was done.

The case of Finnell v. Cramet, Inc., 289 F.2d 409 (6th Cir. 1961) is distinguishable. In this case a corporation sold all of its assets to the General Services Administration of the United States of America on March 17, 1958 pursuant to a contract dated March 7, 1958. The claim was asserted to a share of the pension trust by a group of employees who had last worked on December 31, 1957. The court held that they were no longer participants in the pension trust and that the distribution of the sum made to 427 employees would not be upset for the benefit of the six previously laid-off employees. Again, this case did not involve a union negotiation. In the case at bar all plaintiffs were employees, at least at the date of announcement of closing of the plant, though thereafter layoffs may have proceeded gradually. The Minnesota case of Gorr v. Consolidated Foods Corp., 253 Minn. 375, 91 N.W.2d 772 (1958), also involved a plan which had not terminated and denied rights to previously discharged employees following the wording of the pension plan. No union-company agreement of amendment was involved.

■ This court recognizes the language in International Longshoremen's & Warehousemen's Union v. Kuntz, 334 F.2d 165, 171 (9th Cir. 1964), which would seem to indicate:

" * * * when 'vested rights' are impaired or extinguished in the course of the bargaining, any recourse by the person affected must then depend upon 'a bad faith motive, an intent to hostilely discriminate' on the part of the bargaining representative. And here, even aside from the plaintiff's affidavit asserting that no such discrimination existed, there is not the slightest suggestion of bad faith on defendants part."

That case, however, involved seniority rights where certain clerks were stripped of preferred seniority. This court views seniority as stated above as prospective and not vested and notes also that in the language used in *Kuntz* the court put the term vested rights in quotation marks. The court does not believe that it needs to find bad faith on the part of either the Union or FOK to permit plaintiffs to recover. So far as the record shows, both apparently thought they were doing the reasonable, provident thing to provide three meaningful pensions to those aged 62 to 65 as against permitting a number of small and in some cases almost insignificant pensions for all employees. Unfortunately, as the court views it, both were mistaken and proceeded, albeit in good faith, to do something over which they had no jurisdiction in effect, something which they had no power to do under the rationale of the decided cases without the individual consent of all plaintiffs. By so doing they converted a fund to a share of which plaintiffs were entitled. Innocent misapplication or deprivation of funds owned by others is in the law no less a conversion because such was done innocently or in ignorance.

The court has heard argument from counsel that these plaintiffs are entitled to recover on a *quantum meruit* basis or under an analogous theory. Plaintiffs' counsel points out that in negotiating a labor contract so called fringe benefits, including pension rights, are things that are sincerely bargained for and are the equivalent of wages; that

were fringe rights not to be granted in a collective bargaining agreement the employees most certainly would demand more wages instanter; that it therefore follows that the contributions made on behalf of each employee by FOK should be considered as wages and now should be paid to the employee; that otherwise the employee does not and will not receive his full due. This general theory has been recognized, at least as against a motion for summary judgment, see Lucas v. Seagrave Corp., 277 F.Supp. 338 (D.Minn.1967), and may have merit in supporting the argument that plaintiffs' rights are vested as though accrued wages of the type mentioned in *Elgin* above were involved. In the view the court takes of this case, however, no decision need be made on this question.

■ The court therefore holds that plaintiffs are entitled to judgment jointly against the defendants FOK and the Union in such amount or amounts as are necessary to provide deferred annuities for the monthly pension amounts set forth for each of the 37 plaintiffs in Exhibit 12, page 1. Employees other than the plaintiffs are not before the court and are not members of the class of plaintiffs, so obviously the court cannot and does not adjudicate their rights. The persons unjustly enriched would appear to be the three third-parties defendant aged 62 to 65 who received the converted money in the form of single premium annuities purchased for them. As stated before they have not answered nor appeared in this action. To the extent that the Union is required to pay a judgment or judgments under the terms of this order, recovery may be had, and judgment entered against the three third-parties defendant in proportion as the benefit and cash amount they received or which was expanded for them bears to the amount required hereunder to be paid to plaintiffs by the Union. Plaintiffs will not be entitled to any interest on their judgments, though to the extent that the cost to purchase annuities to fund pensions now at plaintiffs' attained ages may require a larger principal amount than would have been required in 1966, defendants will be required so to do.

■ Plaintiffs' second claim which in any event could only be asserted against FOK and not the Union relates to contributions for "past services credits." Under the Collective Bargaining Agreement as above quoted, FOK agreed to contribute quarterly an amount sufficient to provide pensions at age 65 as though the plan had been in effect from the first day of employment of anyone reaching 65 years of age. To accommodate for past service credits FOK agreed to pay such varying amounts over a period of 20 to 45 years as would provide a pension of $2.00 per month for each year of service even though a number of those years preceded the date of the adoption of the pension plan. Plaintiffs contend that since FOK is continuing as a company and has merely liquidated or closed down its Metal Fabricating Division (treating this division in effect as though it were a subsidiary corporation) it should still be required to compensate for those past service credits and pay the same into the pension fund for plaintiffs' benefit. The court does not hold with this contention.

■ The collective bargaining agreement was terminated on or about June 1, 1966. There is nothing in the collective bargaining agreement (as distinguished from the Group Deposit Pension Contract) for such an eventuality. The termination of employment of the plaintiffs and others was the consequence of the general decision to close the Metal Fabricating Division for economic reasons. A labor agreement does not of course imply an undertaking of the employer to stay in business nor to continue operations nor to furnish any minimum amount of employment. There is no suggestion of any improper motive on the part of FOK in closing down the Metal Fabricating Division. The provision of past service credits must in effect be read with the addendum "assuming employer continues to stay in business" or words to that effect.

This is quite different from the cash amount already accumulated in the fund and which could not revert to the employer under the Treasury Regulations and terms of the pension agreement. The employer in effect promised to fund the pension plan and periodically make past service contributions so long as it was a going concern in the Metal Fabricating Division; not thereafter. In reality, plaintiffs are suggesting that the shutdown and termination required an acceleration of the funding notwithstanding the provisions of the collective bargaining agreement that the funding of the past service credits could occur for a period of not more than 20 years nor more than 45 years and notwithstanding the fact that the collective bargaining agreement by its very terms expired in 3 years, i. e., December 31, 1966 and was renewable thereafter year by year unless and until either party gave 60 days' notice. Plaintiffs argue for a complete and immediate funding on the grounds that otherwise FOK will be able to avoid paying plaintiffs the major part of the benefits for their services that the collective bargaining agreement envisions in the future. In the court's opinion no acceleration provisions can be read into the collective bargaining agreement and since it is now terminated, plaintiffs have no right thereto. Such is not a "vested" right but at best a right contingent on continued life of the Metal Fabricating Division, there being no showing that the Division was liquidated merely to avoid plaintiffs' claims or with some other ulterior motive.

This memorandum opinion will serve as findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The court requests plaintiffs' counsel to submit to the court and to opposing counsel within 20 days from the filing of this memorandum a proposed order for judgment in accordance with the views expressed in this opinion, after which opposing counsel may have 10 days to object thereto and to submit any other proposed or modified order. Thereafter, the court may desire a hearing before entry of an order for judgment, and if so will advise all counsel.

Any such submission as above contemplated is of course without prejudice to the appeal rights of any of the parties from any judgment or judgments that are or may be entered.