John **MORUZZI** et al., Plaintiffs,

v.

**DYNAMICS CORPORATION OF AMERICA and its subsidiaries,** Defendant.

No. 75 Civ. 6339.

United States District Court,
S. D. New York.

Dec. 30, 1977.

Guazzo, Silagi, Craner & Perelson, P. C., New York City, for plaintiffs.

Isaac N. Groner, Cole & Groner, P. C., Washington, D. C., for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

Plaintiffs seek to compel arbitration concerning certain grievances regarding the defendant's handling of a pension fund created pursuant to a collective bargaining agreement. The case is currently before me on defendant's motion to dismiss and cross-motions for summary judgment. For the reasons hereinafter stated, I find that the plaintiffs lack standing to compel arbitration, and defendant's motion to dismiss is granted.

Certain plaintiffs are former employees of a Long Island City, New York plant of defendant's Reeves Instrument Division (hereinafter "Reeves"), suing individually and as the "Reeves Pension Committee." Another plaintiff is "Local 478, International Union of Electrical, Radio, Machine Workers AFL–CIO, by Mike Capuano its President" (hereinafter "Capuano").

### A. Facts

On or about December 12, 1969, defendant Dynamics Corporation of America ("Dynamics") announced in a letter to the employees of Reeves in Garden City that it would cease operations in that plant in approximately 13 months.

From November 3, 1967 through November 2, 1970, there was in effect a collective bargaining agreement between Reeves and "the International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC ("the Union") for and on behalf of and in conjunction with Local .478, International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, its successors and assigns." Part of the agreement was the continued existence of a pension plan, which had been most recently amended in 1964.

Subsequent to the letter announcing the closing of the plant, Local 478 negotiated with Reeves concerning the termination of the Pension Plan. At a July 6, 1970 meeting, Reeves allegedly indicated that it would undertake to fulfill all the responsibilities of the Pension Fund so that all employees would receive pensions and severance pay, even though the Pension Fund itself was not adequate, if the plan were to terminate.

On December 1, 1970, Reeves was permanently shut down. According to Union rules and the various exhibits accompanying the affidavit of David Fitzmaurice, Secretary-Treasurer of the Union, Local 478 ceased to exist as an entity in December, 1970.

Caesar C. Guazzo, counsel for Local 478, wrote Everett Lewis, counsel for District 3 of the Union, on August 31, 1972 in order to offer him information concerning the negotiations involving the Pension Plan as a basis for Lewis' intervention in order ". . . to protect the rights of the employees in accordance with their attestations at that meeting which [I] did not attend."

On the basis of exchange of correspondence in late 1972 and early 1973, Dynamics and Union representatives met on March 1, 1973 in Dynamics corporate headquarters, then in New York City. During this meeting Dynamics representatives revealed that the Pension Plan contained insufficient assets to meet all vested pension obligations. They further related that favorable developments, i. e., a rise in the stock market,

which had been hoped for in 1970 and which would have solved the problems of the Pension Plan by increasing the value of its assets, had not occurred, nor were they likely to occur within the foreseeable future. Therefore, the March 1, 1973 meeting was largely devoted to exploring alternative courses of action for the final resolution of the Pension Plan. A consensus was reached at this meeting that the probable best course would be to sell the assets of the Pension Plan to an insurance company.

On August 27, 1973, letters were sent to the former members of Local 478 informing them that there were insufficient assets in the Pension Plan to pay all vested benefits. The letter pointed out that only "pensioners and joint annuitants or beneficiaries to whom benefits have commenced to be paid" would be paid benefits under the terminated plan, and that those pensioners and annuitants would receive approximately 80% of their former level. Therefore, those plaintiffs whose benefits had commenced as of August 1973 have been deprived of 20% of their benefits contemplated in the Pension Plan, and those plaintiffs whose benefits had not commenced in August 1973 have been deprived of 100% of such benefits.

On March 5, 1974, Mr. Guazzo on behalf of Capuano and the "Reeves Pension Committee" sent Dynamics a "Notice of Intention to Arbitrate" concerning the Pension Plan. Edward Mooney, a Dynamics vice-president, replied that Dynamics was at that time involved in Chapter XI proceedings, and that Bankruptcy Judge Ryan had issued a stay order.

On May 29, 1974, Mr. Guazzo filed a complaint in the bankruptcy proceeding seeking to have the stay vacated. On January 13, 1975, Judge Ryan issued an order which vacated the stay. However, Judge Ryan emphasized that he was not ruling on the merits or on the arbitrability of the dispute.

The plaintiffs contacted the American Arbitration Association (hereinafter "AAA"), the vehicle for arbitration mandated by the Pension Plan agreement, and demanded arbitration. After a series of letters from both parties, AAA in a letter dated February 18, 1975, declined to arrange an arbitration unless there was a court order or an agreement of the parties to arbitrate. On April 24, 1975, AAA confirmed this position.

On November 11, 1975 plaintiffs instituted an action to compel arbitration in the Supreme Court of New York (New York County). On December 19, 1975 defendant removed the action to this court as there was the requisite jurisdiction pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

### B. Standard of Review

██ The question of arbitrability must be resolved by analysis of the contracts pertaining to the pension fund according to the appropriate substantive federal law. *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Arbitration, however favored by the courts and the Congress, is a contractual right. It may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration:

> Our prior decisions have indeed held that the arbitration duty is a creature of [contract] and that a party cannot be compelled to arbitrate any matter in the absence of a contractual obligation to do so.

*Nolde Brothers, Inc. v. Local 358 Bakery and Confectionery Workers Union, AFL–CIO*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). *See also, Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co.*, 312 F.2d 181, 184–5 (2d Cir. 1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963).

██ The standard for the role of the judiciary in cases seeking to compel arbitration is set forth in *United Steel Workers of America v. Warrior & Gulf Navigation Co.*,

363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), which isolates the question for the court as being whether the reluctant party (here Dynamics) agreed to arbitrate the grievance:

> The Congress . . . has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*Id.* at 582–83, 80 S.Ct. at 1353.

It is therefore my duty to determine if this dispute is subject to the arbitration clauses of the various agreements pertaining to the pension plan in question.

1. *Individually named plaintiffs and collective "Reeves Pension Committee"*

At the time the Reeves plant was closed, the provisions of the pension plan gave the Union the right to arbitrate any dispute concerning Dynamics action with respect to the pension plan:

> 9.2 The Company shall have the power and duty to take all actions and to make all decisions necessary and proper to carry out its duties under the Plan. The powers and duties of the Company shall include the power to interpret the Plan, subject to the right of the Union to arbitrate any dispute, concerning such interpretation or action taken by the Company hereunder.
>
> 10.1 This Plan shall not be deemed to constitute a contract between the Company and any Employee, or to be consideration for, or an inducement or a condition of the employment of any Employee.
>
> 10.9 If any dispute (other than that covered in Section 9.3) shall arise covering any provision of this Plan between or among the Company, Union, the Pension Committee and an interested Employee or Pensioner, such dispute shall be resolved pursuant to the applicable grievance and/or arbitration procedures specified in the collective bargaining agreement then in force between the Company and the Union, except that The American Arbitration Association shall be substituted for the New York State Board of Mediation.

At the time the Reeves plant was closed, the provisions of the collective bargaining agreement pertaining to arbitration made it clear that only Dynamics or the Union could initiate arbitration: [1]

> 24.04 Arbitration proceedings may be initiated by the Union or the Employer.
>
> 23.07 In the event the dispute is not settled in the Third Step, the matter shall be referred to arbitration in accordance with Article XXIV. Pending arbitration and upon the Union's election, the International Representative, along with the President of the Union, shall be afforded the opportunity to meet with the Vice-President of Industrial Relations for the

---

1. The agreement reached between the Union and Dynamics in 1973 which disposed of company control of the pension fund contained no provisions regarding arbitration. Therefore, any duty to arbitrate this dispute had to arise from the 1967 collective bargaining agreement (or the pension plan itself) which was in effect at the time the Reeves plant closed in 1970.

*See, Nolde Brothers, Inc. v. Local 358, Bakery and Confectionery Workers Union, AFL–CIO,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), where the Court held that an expired collective bargaining agreement's provisions mandating arbitration may be enforced subsequent to the termination of the contract.

purpose of settling any grievances scheduled for arbitration.

25.03 The parties hereto agree that any dispute or difference with respect to the interpretation and application of the provisions of the subject Pension Plan as they may affect the employees of the Bargaining Unit shall be subject to arbitration as a union-company Grievance beginning at the third step of the grievance procedure in Article XXIII of this agreement subject to the applicable and existing provisions of the subject Pension Plan which shall govern.

24.01 . . . If no such notice is received by the Company or the Union, as the case may be, within said ten (10) working day period, the grievance shall be considered settled automatically . . . ."

From the above provisions it seems that the intent of the parties was for arbitration to be a remedy only available to Dynamics and the Union, not to individual employees. Any other interpretation of the language cited above would be stretching the meaning of the words beyond any reasonable evaluation of the contracting parties' apparent desires when the contracts were drafted. Further, cases in this Circuit have held that arbitration is "not ordinarily a right incident to the employer-employee relationship, but . . . incident to the relationship between employer and union. *Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., supra* at 184. This Circuit also stated that:

[c]haos would result if every disenchanted employee, every disturbed employee, and every employee who harbored a dislike for his employer, could harass both the union and the employer by processing grievances through the various steps of the grievance procedure and ultimately

by bringing an action to compel arbitration in the face of clear contractual provisions intended to channel the enforcement remedy through the union.

*Black-Clawson Co. v. International Association of Machinists Lodge 355, District 137,* 313 F.2d 179, 186 (2d Cir. 1962).

■ Therefore, while bearing in mind the aforementioned statement that "[d]oubts should be resolved in favor of coverage," *United Steel Workers of America v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 583, 80 S.Ct. at 1353 (1960), I find that the pension plan and the collective bargaining agreement provisions relating to the arbitration of grievances do not apply to the individual plaintiffs or to the "Reeves Pension Committee" which they formed subsequent to the closing of Reeves, and said plaintiffs lack standing to compel arbitration.

### 2. *Plaintiff Capuano*

■ It remains for my determination whether the remaining plaintiff, Capuano, has legal standing to compel arbitration as the union party to the arbitration agreements. Initially, it should be noted that in arbitration between the parties prior to the closing of Reeves, Local 478 did handle the grievances which proceeded to arbitration without the inclusion of the Union as a party. Therefore, if Local 478 is in existence it would be entitled to compel arbitration under the agreements.[2] Nevertheless, it is apparent that Local 478 is no longer a viable entity, despite the fact that the former Reeves employees "are asserting Local 478's authority to act for them in an arbitration to enforce vested pension rights."[3]

Dynamics contracted with Local 478 of the Union, an established international labor union. The language of the collective

---

**2.** Due to the standing problem of Capuano, it is unnecessary to reach any determination of the other issues raised by Dynamics. This statement merely refers to the contention that Local 478 alone could never compel arbitration.

**3.** "Memorandum in Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment" at 20.

bargaining agreement is clear. Dynamics contracted with "the International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, for and on behalf of and in conjunction with Local 478, International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, its successors and assigns . . . ." The party who is claiming to be "Local 478" in this case, Capuano, certainly bears no relation to that mentioned in the contract; it is an unofficial organization of former employees of Reeves. From the affidavit of the International Secretary-Treasurer of the Union it is clear that the Local 478 which existed under the Union's auspices ceased to exist upon the closing of Reeves, or shortly thereafter.[4] It is also clear that Capuano became neither the successor to nor the assignee of the defunct Local 478 by adopting the use of its name. To hold that Capuano is entitled to compel arbitration in the manner mandated by the agreements would essentially be to permit any group of former employees to band together in any suit against their former employer and claim the rights, privileges, and legal position of their former labor union. Clearly this was not the intention of the parties to the agreement. Indeed the Union, in affidavits by its attorney, Everett Lewis, and its International Secretary-Treasurer, David Fitzmaurice, has indicated its rejection of plaintiff Capuano's right to compel arbitration.

Therefore, I find that Capuano lacks standing to compel arbitration.

*Conclusion*

Under these circumstances, I decline to compel arbitration of the grievances concerning the handling of the pension plan by Dynamics.

However, I wish to stress my concern that Dynamics and the Union in this case may well have acted in contravention of law when they agreed to cease payments to plaintiffs provided for by the collective bargaining agreement. While an action for arbitration is not proper, plaintiffs may have recourse pursuant to other legal theories. It should be noted that the courts have reached the merits of similar disputes in actions other than one to compel arbitration. *E. g., Hurd v. Hutnik*, 419 F.Supp. 630 (D.N.J.1976); *Baake v. General American Transportation Corp.*, 351 F.Supp. 962 (N.D.Ill.1972); *Hauser v. Farwell, Ozmun, Kirk & Co.*, 299 F.Supp. 387 (D.Minn.1969). A decision on the merits must await submission on an appropriate cause of action.

SO ORDERED.

---

**4.** (4) Under Article XVII, Section B of the IUE [Union] Constitution, a local that dissolves is required to send the International Secretary-Treasurer all of its funds and property and if application for the reissuance of said local's charter is made by at least fifteen (15) former members within one year thereafter, the funds and property of said local will be returned. In the instance of IUE Local 478's members, the closing down of the Reeves Instrument Plant permanently terminated their employment relationship, and there has never been any request to reestablish Local 478 as a viable organization.

(5) As verified by the attached Final LM–3 Form No. 007904 (Exhibit A) filed on behalf of Local 478 for the period 1/1/70 through 12/31/70, the Local sold all of its assets upon the cessation of its operations and its files were thereupon turned over to Edward Flaherty or Michael Siomkin as representative of the International Union. Likewise, as verified by the Final Audit (Exhibit B) the Local had a zero equity as of December 31, 1970, and its members ceased paying dues prior to December 1, 1970 when they all became unemployed because of the permanent closing down of the Reeves Instrument Plant.
Affidavit of David Fitzmaurice, Secretary-Treasurer of the Union, dated February 3, 1976.