**William J. HURD et al., Plaintiffs,**

v.

**Edward HUTNIK et al., Defendants.**

Civ. A. No. 74–899.

United States District Court,
D. New Jersey.

Sept. 10, 1976.

As Amended Sept. 23, 1976.

Schwartz, Steinberg & Tobia by Ronald L. Tobia, East Orange, N. J., for plaintiffs.

Harry Krieger, East Orange, N. J., for defendants Alderney Dairy Company, Inc. and Johanna Farms, Inc.

Pitney, Hardin & Kipp by S. Joseph Fortunato, Morristown, N. J., for defendant Borden, Inc.

Martin D. Cohen, Newark, N. J., for defendants Marx, Goldman, Hayman, Rockoff, Glenby & Tanis.

Parsonnet, Parsonnet & Duggan by Thomas L. Parsonnet, Newark, N. J., for defendants Hutnik and Mashuh.

Walder, Steiner, Sondak & Evenchick by Justin P. Walder, Newark, N. J., for defendant Tuscan Dairy Farms, Inc.

Philip J. Mylod, Bloomfield, N. J., for defendant O'Dowd's Dairy.

Stryker, Tams & Dill, John J. Rizzo, Newark, N. J., for defendant Dairylea Cooperative, Inc.

Hellring, Lindeman & Landau by Bernard Hellring, Newark, N. J., Receiver, pro se.

Professor Leonard Orland, University of Connecticut, West Hartford, Conn., for Certain Pensioner plaintiffs.

Lowenstein, Sandler, Brochin, Kohl & Fisher by Matthew P. Boylan, Newark, N. J., for All-Star Dairies, and others.

Wicoff & Voorhees, Trenton, N. J., for defendant Walker Gordon Lab. Co.

Bernstein, Schocket & Krieger, Newark, N. J., and Botein, Hays, Sklar & Herzberg by Arnold Chase, and Buffum Lovell, New York City, for defendants Gannon Bros. Inc., Kudile Bros—Hasbrouck Heights Dairy Inc.

Brown, Cass & Connolly by Harold J. Brown, Bloomfield, N. J., for third-party plaintiffs Arthur Baxter, and others.

Patrick J. Diegnan, Jr., South Plainfield, N. J., for third-party plaintiffs Patrick J. Diegnan, and others.

Barry S. Slevin, Washington, D. C., for defendant Pension Benefit Guaranty Corp.

## OPINION

STERN, District Judge.

The complaint in the present lawsuit was filed on June 18, 1974. It involves a multi-employer pension fund established for the benefit of the milk drivers and dairy employees of northern New Jersey. Though the case has changed in focus and grown in size and complexity since that date,[1] it now

---

1. The Court has jurisdiction under 29 U.S.C. § 185(a), 186. *See, e. g., Leonardis v. Local 282 Pension Trust Fund,* 391 F.Supp. 554 (E.D.N.Y. 1975).

The initial complaint was filed on June 18, 1974 by certain active employees of defendant Tuscan Dairy Farms, Inc. Plaintiffs were all members of Local 680, Milk Drivers and Dairy Employees Union, International Brotherhood of Teamsters (Local 680). These plaintiffs brought suit individually and as representatives of a putative class of active Tuscan employees. The complaint alleged that plaintiffs were or would be entitled to pension benefits upon their retirement, pursuant to a multi-employer pension plan put into effect under a collective bargaining agreement between Local 680 and defendant Tuscan, among other employers.

The plan was promulgated pursuant to an agreement and declaration of trust (R–2) first adopted in 1962 and amended on several occasions to date. The trust agreement sets out the structure of a pension trust fund designed to qualify to receive employer contributions under the Taft-Hartley Act, 29 U.S.C. § 186(c)(5), and to permit the employers' contributions to be tax-deductible under the Internal Revenue Code. The pension plan itself was promulgated by the trustees pursuant to authority derived from the contracting parties in the trust agreement.

The statute provides that the employees and the employers be equally represented in the administration of the pension fund. Though the instant trust agreement provides for a board of six to nine members, three of whom shall be union-appointed trustees and three to six of whom shall be employer-appointed trustees, equal representation is purportedly assured by affording only one vote to the "employer trustees," as a group, and one vote to the "union trustees." In practice, the board has been composed of five "employer trustees" and three "union trustees."

Plaintiffs contended that the defendant trustees of the pension fund had continued to make pension benefit payments to retired employees of employers which had ceased making contributions to the fund. Defendant Borden, Inc. was named specifically as one such employer, along with "other unknown John Doe defendants." As a result of these actions, according to the complaint, the assets of the fund were depleted to the point where "the unfunded actuarial liability of the Fund is in excess of the Fund's assets," to the prejudice of plaintiff employees of currently-contributing employers, who "will not receive pension and retirement benefits from the Fund upon their retirement." (Complaint, ¶ 10)

The complaint made similar allegations with regard to defendant Alderney Dairy Company, Inc., which was alleged to have transferred its employees to defendant Johanna Farms, Inc., a non-signatory, to avoid paying fund contributions on their behalf.

On October 29, 1974 the Court heard oral argument on several motions. On application of counsel for the "union trustees," and with the consent of counsel for plaintiffs and counsel for defendants Johanna and Alderney, the motions were continued until December 23, 1974 to enable counsel for the "union trustees" to pursue an application for partial termination and insurance of the fund by the newly created Pension Benefit Guaranty Corporation (PBGC). (Tr. 10/29/74: 14–24) The Court directed that no motions be listed for a period of sixty days

Note 1—Continued

to enable counsel to confer to determine whether substantive determinations by the Court would be necessary or whether the intervention of the PBGC would resolve the issues at bar. The case was listed for status conference on March 5, 1975. Although more than five months had elapsed since counsel for the "union trustees" had suggested a sixty-day adjournment to permit him to file an application for partial termination with the PBGC, no such application had yet been filed. At the status conference the Court was informed that the existing collective bargaining agreement would expire in November, 1975. Counsel for the "union trustees" stated that by the expiration of the agreement, "I'm sure [there] will . . . have been a partial termination." (Tr. 3/5/75: 7–8) Counsel for the "employer trustees" urged the Court to continue to refrain from acting pending the decision of the PBGC. (Tr. 3/5/75: 17–18) Counsel for the "union trustees" concurred: "I'm trying to persuade the court to wait until the corporation acts at least for a reasonable time." (Tr. 3/5/75: 20)

Counsel for Johanna and Alderney suggested that the solution to the lawsuit might come in the upcoming collective bargaining. Counsel for the "union trustees" observed, however, that the union "would have no right to agree to a reduction of [a retired pensioner's] benefits." (Tr. 3/5/75: 33–34)

At the conclusion of the status conference counsel for the "employer trustees: recommended that the Court allow counsel a minimum of two additional months to report whether the PBGC would grant relief. (Tr. 3/5/75: 42) Counsel for Alderney and Johanna recommended that the Court "postpone this matter until we get some answer one way or another from the government." (Tr. 3/5/75: 43) Counsel for the "union trustees" suggested a one-month postponement to enable the PBGC to act, and recommended further postponements thereafter if no action was forthcoming from the Corporation. (Tr. 3/5/75: 43–44) Plaintiffs and defendant Tuscan asked that a receiver be appointed for the fund. (Tr. 3/5/75: 38–39, 44) The Court asked counsel for the "union trustees" how much more time the fund actuary, The Martin E. Segal Company, would require to submit the application for partial termination to the PBGC. Counsel stated that he had been informed that the compilation of the information requested January 3, 1975 would consume another two to three weeks. The Court ordered counsel to produce a representative of the Segal firm on March 12, 1975 if the report could not be filed by March 10, 1975. (Tr. 3/5/75: 50–54)

At the continued status conference on March 12, 1975, Thomas W. Fitzgerald, vice president of The Martin E. Segal Company, appeared with counsel. Counsel stated that a draft partial termination proposal could not be put before the fund trustees before March 31, 1975,

and that the earliest the trustees could meet to submit the proposal to the PBGC would be April 8, 1975. (Tr. 3/12/75: 15) Mr. Fitzgerald testified that the condition of the fund had continued to worsen since his last report to the trustees on March 31, 1974. (Tr. 3/12/75: 63) According to Fitzgerald's testimony on May 27, 1976, the fund had a market value of approximately $4,350,000 on that date. The market value of the fund in September, 1974, shortly after the instant suit was instituted, was estimated by Fitzgerald at $5,500,000. Fitzgerald projected a monthly pension benefit expense of $235,000 for 1976–1978. (Tr. 5/27/76: 92) He estimated that the fund's resources would be exhausted in late October or early November, 1977. (Tr. 5/27/76: 93)

At the conclusion of the hearing, counsel for plaintiffs renewed his motion for the appointment of a receiver for the fund. (Tr. 3/12/75: 70) It was at this juncture that the issue of the representation of the pensioners who were not parties to the action, was first raised. Counsel for plaintiffs stated that he did not believe he could represent both the plaintiff active employees and the pensioners because of a potential antagonism of interest between the two groups. (Tr. 3/12/75: 71–72) Counsel for Tuscan now opposed the application. (Tr. 3/12/75: 73) Counsel for the "union trustees" urged the Court to dismiss the lawsuit, contending that the union would adequately represent both active employees and retired pensioners in the upcoming collective bargaining. (Tr. 3/12/75: 80–82)

The Court indicated an inclination to let the pending motions, including the application for the appointment of a receiver, go forward. Counsel for the "employer trustees" then requested a further stay until May 1, 1975, to enable the PBGC to act. (Tr. 3/12/75: 84) The motion for class action determination was set for hearing on April 28, 1975.

The motion for class certification was subsequently withdrawn by plaintiffs on September 8, 1975, as was plaintiffs' motion to amend the complaint.

Yet another status conference was called sua sponte by the Court for October 22, 1975, in the presence of the Deputy General Counsel of the PBGC, George Driesen. Mr. Driesen reported that the PBGC had denied the fund's application for a partial termination, but had left open the possibility of the granting of a complete termination if the trustees were to amend their application. Counsel for the "employer trustees" stated that "the real problem is under ERISA, Section 4064. In the case of a termination of a multi-employer plan, the corporation is given the power to proceed against contributing employers in the same proportion as their cumulative contributions for the preceding five years have been." (Tr. 10/22/75: 4) Counsel indicated that the statute permitted the PBGC, in the exercise of its discretion, to waive the

Note 1—Continued

imposition of employer liability. (Tr. 10/22/75: 3)

Once again the Court raised the issue of a potential conflict of interest inherent in the position of the fund trustees, who were appointed by the employers and by the union but whose first fiduciary duty was to the pensioners. If the interests of the pensioners would be best served by an application for full termination, regardless of whether the PBGC imposed liability on the employers, the dual role of the "employer trustees" could create a substantial conflict. Counsel for the "employer trustees" admitted to the Court that those trustees "can't overlook the fact that the employers by whom they are employed, as it happens, may be subject to liability. They can't overlook the fact that they have a collective bargaining agreement which is about to be renegotiated in the next month." (Tr. 10/22/75: 57–58) The Court and counsel for the "employer trustees" had the following colloquy:

THE COURT: If they can't overlook those facts, doesn't their duty as fiduciary to the men require them to overlook that fact?

MR. COHEN: It certainly makes their principal—primary and sole responsibility as trustees that they discharge their duties in a way which is—

THE COURT: So the answer to my question is yes?

MR. COHEN: —to protect—

THE COURT: Is the answer to my question yes?

MR. COHEN: As to their primary responsibility.

THE COURT: Their only responsibility as trustees.

MR. COHEN: The answer is yes.

THE COURT: Then you are telling me that they cannot overlook things which they are required not to consider. Isn't that so?

MR. COHEN: I'm saying as representatives of dairies it would be very difficult for them not to consider the impact upon their employers, of course. . . .

. . . . .

THE COURT: . . . You tell me that there are competing interests operating on their minds, are you?

MR. COHEN: I would be less than candid if I didn't acknowledge that, your Honor.

THE COURT: How can I permit it to continue?

MR. COHEN: I don't think your Honor has had any evidence up to this point of any act on the part of any trustee which is inimicable [sic] to the interests of [pensioners] and active employees.

THE COURT: What is required more than your telling me that a fiduciary is [in a] conflict of interest? Does he have to actually commit an act violative of his duty?

. . . . . .

THE COURT: You have made a motion to have this whole fund taken over by a court-appointed receiver?

MR. TOBIA: Yes, I have your Honor.

THE COURT: I don't know that maybe I shouldn't grant that. I'm very reluctant to grant it.

MR. PARSONNET: I think it would be effectively destroying the entire organization. I think it would be the worst thing that could happen. . . .

(Tr. 10/22/75: 58–50) Before setting the motion for the appointment of a receiver for hearing on November 10, 1975, the Court made the following observation:

THE COURT: . . . [I]t may well be to the employers' interest right now to contend there is enough money in that fund to keep it going until 1978 for two reasons: Number one, to avoid the impact of the present lawsuit; and, number two, to avoid Mr. Driesen's indemnification questions.

(Tr. 10/22/75: 63) Additional industry employers were added as party defendants by order filed October 27, 1975.

On November 10, 1975, the Court denied the motion for the appointment of a receiver, but ordered the trustees to file a status report on the condition of the fund with the Court every sixty days. (Tr. 11/10/75: 2)

On or about November 30, 1975, the current collective bargaining agreement between the Milk Industry Association and the union expired. In negotiations for the new agreement the employers took the firm position that the existing pension plan must be terminated. As it had done in the past, the union rejected this proposal. The employers would not cede this point, and the union went on strike. The strike was thus called to protect the pension rights of former union members who had retired on pension. The strike lasted one day. It was settled by the signing of a new two-year agreement which contained the following provisions:

(1) the existing fund was to be terminated, and all contributions by the employers were to cease;

(2) higher contributions were to be made by the employers to the welfare fund on behalf of active employees;

(3) active employees were to receive a $38 per week raise over the two-year term of the new contract, approximately a seven per cent salary increase;

(4) each employer was to establish a new, single employer pension plan for his active employees which would afford them benefits identical to those provided by the terminated plan, and would give them full pension credits for the period worked under the old plan.

The new collective bargaining agreement made no provision for continued pension payments to retired employees. *See infra* at 20–21; Tr. 8/9/76: 326–334)

Note 1—Continued

The Court convened a further status conference on February 24, 1976. Plaintiffs' motion to amend the complaint was withdrawn on that date. (Tr. 2/24/76: 69) Counsel for the "union trustees" notified the Court "that the Pension Fund was terminated on November 30, 1975; and that thereafter the Union negotiated with each employer, except two small ones with whom it is negotiating today, for the establishment of a private pension plan guaranteed by an insurance company." (Tr. 2/2/4/76: 2)

The status conference made clear that the interests of plaintiffs, who were present employees of the defendant employers, had been protected by the new collective bargaining agreement. (Tr. 2/24/76: 4) Counsel for the "union trustees" pointed out that the new collective bargaining agreement "leaves the present pensioners, for whom care must be taken in some way. We are asking PBGC to do that." (Tr. 2/24/76: 6) He advocated dismissal of the entire action until the PBGC determined whether to grant the pending application for a full termination of the fund. (Tr. 2/24/76: 7)

The Court indicated its concern that the present pensioners, whom the new collective bargaining agreement left unprotected, were unrepresented and would have no notice of such a dismissal. Counsel for plaintiffs suggested that the Court appoint counsel to represent the pensioners (Tr. 2/24/76: 9), after erroneously representing to the Court that the original complaint covered retired pensioners as well as active employees. (Tr. 2/24/76: 11–12) Counsel for the union trustees opposed that recommendation. The Court questioned counsel for Tuscan concerning the presence of a conflict of interest on the part of the "employer trustees." (Tr. 2/24/76: 27 et seq.)

The Court questioned counsel for the "union trustees" concerning the ability of the "union trustees" to represent the present pensioners as fiduciaries, in view of the fact that the new collective bargaining agreement which the union had signed had left the pensioners unprotected. (Tr. 2/24/76: 31 et seq.)

Counsel for Johanna and Alderney stated that in his view the interests of the employers and the "employer trustees" were "absolutely" adverse to those of the pensioners, because of the possibility of employer liability if the PBGC granted the termination of the fund. (Tr. 2/24/76: 44–45)

Counsel for plaintiffs renewed his suggestion that the Court appoint counsel for the pensioners. (Tr. 2/24/76: 65) Only counsel for the "union trustees" expressed the belief that the Court lacked authority to do so. (Tr. 2/24/76: 66) The Court also raised the question whether it had authority to act with respect to the administration of the fund if it found that the trustees were in a conflict of interest. (Tr. 2/24/76: 70–73) The Court directed counsel to brief those two questions and requested counsel for the "union trustees" to supply the latest actuarial figures on the current financial status of the fund.

After reviewing the submissions of counsel, the Court filed an opinion and order on March 24, 1976 in which it determined that the trustees were in a conflict of interest, and appointed Bernard Hellring, Esquire as receiver of the fund. The opinion and order are attached hereto as Appendix A.

On March 31, 1976, the Court heard motions by the "union" and "employer" trustees for vacatur or stay of the order appointing the receiver, which motions were denied, and by the receiver for approval of a form of notice to the present pensioners. Counsel for the "union trustees" opposed the receiver's motion to give notice to the pensioners of his appointment and of the status of the suit and the impending insolvency of the fund. Counsel for the "union trustees" stated: "I feel that this is not the time at which these pensioners, some of whom are very aged, should be worried about the continuance of their benefits." (Tr. 3/31/76: 14) Counsel for the "employer trustees," though he disagreed with the Court's order appointing the receiver, agreed that once the receiver was appointed there should be notice to the pensioners. (Tr. 3/31/76: 40) The Court ordered that notice be provided. (Tr. 3/31/76: 46–47)

Notice was subsequently sent to the pensioners. The receiver filed a petition seeking various forms of relief against the defendant employers, the defendant trustees and the PBGC:

(A) An order directing the defendant employers to make all current contributions for pension benefits into the Local 680 Fund, and enjoining them from diverting those contributions into the individual pension plans set up under the new collective bargaining agreement;

(B) An order directing the defendant employers to account to the Local 680 Fund for all contributions made to the private pension plans during the pendency of this action, and directing that those monies be turned over to the Local 680 Fund;

(C) An order directing the trustees to take all steps provided under the trust agreement to collect the pension contributions being made by the defendant employers to the new private pension plans;

(D) An order directing the PBGC to undertake administration of the fund and to insure future fund payments to the pensioners;

(E) An order directing the trustees to withdraw their requests to the PBGC for waiver of employer liability;

comes before the Court for resolution of the one critical question from which all the issues flow:

> When employers who have previously entered into a multi-employer pension plan find the plan too expensive to maintain, may they enter into a new agreement with the union extinguishing the pension fund by eliminating further contributions to it, while making no provision for the financial protection of some 1400 former employees who have retired and are currently receiving pension benefits from the fund?

Though there may be circumstances permitting such action, the Court finds on the facts before it that the parties contracted for a lifetime pension, and that the subsequent termination was therefore a breach of contract. In addition, the Court holds that where employers have given other assurances of a lifetime pension and employees elect to retire in reliance thereon, the doctrine of promissory estoppel bars such a later termination of the fund.

## I. The Operative Documents

The pension fund in question was created by an Agreement and Declaration of Trust (R–1) adopted pursuant to the governing collective bargaining agreement over a period of years. The original trust agreement was adopted on April 16, 1962 and was successively amended on March 31, 1970, April 30, 1970, and December 1, 1971. R–1 is the trust agreement as amended and as ratified and affirmed on August 25, 1972. The pension plan was adopted pursuant to Article III, Section 4 of the trust agreement. R–2 is the pension plan booklet distributed to the employees. R–2 contains certain questions and answers relating to the pension plan, and the latest text of the plan itself. Changes through the last collective bargaining agreement, which expired on November 30, 1975, are included on a gummed insert attached to the last page of R–2.

Note 1—Continued

(F) An order directing such deferral or reduction in current pension benefits as necessary to ensure the continued existence of the fund beyond January 1, 1978, when ERISA would require the PBGC to insure the fund's termination.

The petition was made returnable on May 27, 1976, along with the receiver's motion to join the pension beneficiaries as necessary parties to the suit. At the hearing on May 27, 1976 the motion to join the pensioners was granted. Items B and C and that portion of item A which related to an injunction against employer contributions into the new pension plans were denied. The Court declined to rule on items D, E and F until it had resolved the fundamental question underlying the first part of item A:

Are the pension rights of a pensioner who retired during the life of a given collective bargaining agreement vested, so that subsequent collective bargaining agreements signed after his retirement cannot alter those rights?

To the extent that the minutes and docket sheet of this Court reflect any different disposition, reference to the transcript of the proceedings before the Court on May 27, 1976 demonstrates that they are in error.

On the date of the hearing, May 27, 1976, the receiver filed a "third-party complaint" in which he embodied prayers for the relief sought in his petition. Extensive evidentiary hearings and oral argument were conducted before the Court on May 27, 1976, June 16, 1976, June 17, 1976, June 18, 1976, and for twelve hours on August 9, 1976. This opinion will resolve the question posed above, in addition to the motion to dismiss the complaint by Johanna Farms renewed on August 9, 1976. The Court notes that the PBGC has yet to act on the application for full termination.

Appeals from the order appointing the receiver were filed by both the "union trustees" and the "employer trustees." The "union trustees" thereafter instructed "their" counsel, Mr. Parsonnett, to abandon their appeal and to cooperate in every way with the receiver. The Court is now presented with the anomaly of two counsel appointed to represent one client—the trustees—and to be compensated from the corpus of the beneficiaries' trust, each of whom now claim to represent only one segment of the board and takes adverse positions to the other on actually every issue now before the Court. Indeed counsel for the "employer trustees," Mr. Cohen, has repeatedly sought to invoke the power of the Court to sanction the payment of his fee from the corpus of the trust over the objections of the receiver and the pensioners, who contend that he has taken positions antagonistic to their own. The Court has ruled that these issues are not properly before it at this time. The appeal of the "employer trustees" pends before the Court of Appeals.

The Court finds as a fact that R–14 is the collective bargaining agreement in effect between the union and management from November 30, 1973 to November 30, 1975. The parties have offered a great deal of testimonial and documentary evidence on the issue whether the following language was inadvertently omitted from R–14 when it was printed:

It being understood, however, that the agreement is limited to contribution without guarantee of benefits by Union or Employer and without right of refund to Employer.

The quoted language is from Schedule F, ¶ 3 of R–10, the collective bargaining agreement booklet which expired October 31, 1967. Similar language was continued in the agreement which expired in 1969, as represented by R–11, the settlement agreement for 1967–1969. (Tr. 8/9/76: 117) Since that date the language has not appeared in subsequent collective bargaining agreements with respect to the pension plan, though similar language has uniformly appeared with respect to the welfare plan.

The deletion is immaterial to the Court's resolution of the issues before it. The evidence adduced by the defendant employers on this point demonstrates that the language in question was bargained away by the parties for reasons unrelated to the issue whether the governing documents promise a pension for life or merely for the term of the current collective bargaining agreement.

Defendants called Lawrence W. McGinley, president of the union during the relevant period. It was his testimony that the "no guarantee" provision had been inserted into the contract at the employers' request during negotiations on a contract in which the employers had convinced the union to agree to a level of employer contributions below the level recommended by the fund actuary, the Martin E. Segal Company, as actuarially sound based on its projection of retiree life span, rate of retirement and other relevant factors. (Tr. 8/9/76: 114–115) During the 1969 negotiations, according to McGinley's testimony, the level and timetable of agreed employer contributions was such that the union "felt strongly that it was no longer necessary to have that language in there, that the new benefits, that portion of the new benefits, would have to be guaranteed." (Tr. 8/9/76: 109–110)

Thus if it had any meaning at all the disputed language referred to the agreed *level* of benefits and not to the agreed *duration* of benefits, which is the issue before the Court:

THE COURT: Let me see if I understand this whole controversy. Anyway, this "no guarantee" provision was there to guard against the computation error which may have been made [in] providing for increased benefits; is that it?

THE WITNESS: That's my opinion, your Honor.

THE COURT: Was it there to alert people that if they retired after 25 or 30 years of service, that no guarantee provision meant their pension would not outlive the life of the agreement itself unless it was bargained for again?

THE WITNESS: No. That was not the purpose of it.

(Tr. 8/9/76: 133)

Thus whether the deletion was merely a "scrivener's error," as defendants claim, or a material term of the contract bargained by the parties, as the receiver and the pensioners contend, is immaterial here. Nevertheless, so that the record shall be complete, the Court finds as a fact that despite some conflict in the testimony the printed booklets R–9, R–10, R–11, R–12, R–13 and R–14 constitute the agreement in effect between the parties for the contract periods covered by each. (Tr. 8/9/76: 274) While there was other testimony from representatives of the milk companies to the contrary, after hearing all of the testimony the Court finds McGinley's testimony to be accurate, and finds as a matter of fact that it is the printed booklets, signed by each of the companies, which are the collective bargaining agreements for each period. The Court further finds that the "without guar-

antee" language was deliberately deleted after 1969 in the course of collective bargaining.

It was these booklets, and not the rough outline agreements hurriedly produced and signed at the end of a particular bargaining session, which in fact governed the relationship of the parties during their term. McGinley testified that it was not uncommon for additional details to be agreed upon after the negotiations ended, that these additions were written into the text sent to the printer and that the printer's galleys were checked by the employers, each of which signed the resulting printed booklets, R–9 through R–14, which were the actual formal agreements. (Tr. 8/9/76: 267–269) When the employers met to discuss upcoming collective bargaining sessions, according to Milk Industry Association vice-president Dan Wetlin, Jr., it was these booklets upon which they relied for the text of the present contract. (Tr. 8/9/76: 79) It was these booklets, according to McGinley, that were distributed to the employers' supervisory personnel for use in the event of on-the-job disputes. (Tr. 8/9/76: 268) When copies of the collective bargaining agreement were requested by any agency for any purpose, Wetlin testified, it was these booklets which were provided. (Tr. 8/9/76: 77, 80) The testimony of both collective bargaining parties confirms the Court's conclusion, and its consideration of the collective bargaining agreement will be based on the printed agreements for each relevant period. (R–9 through R–14)

The pension program set forth in R–1 remained in effect after November 30, 1973 as modified in Schedule F of R–14. As noted earlier, R–2 contains a gummed insert reflecting these changes. R–1 was entered into by the parties pursuant to Schedule F of the collective bargaining agreement, as reflected in the preamble to R–1. Article III, Section 1 of the trust agreement created the "Milk Industry—Local 680 Pension Fund." Article III, Section 4 provides in pertinent part as follows:

Section 4. The Milk Industry—Local 680 Pension Fund is created and established for the purpose of providing and main-

taining pension and retirement benefits for Employees.

The Trustees shall promptly agree upon and formulate the provisions, regulations and conditions of the pension program herein contemplated and any appropriate amendments thereto, including those relating to eligibility of Employees, retirement age, and other terms required to carry out the intent and purposes of the pension program required by the Collective Bargaining Agreement, and any and all other matters relating thereto which the Trustees may deem appropriate for the determination of retirement benefits and the administration of the pension program. A copy of such pension plan shall be adopted and filed by the Trustees as part of the records and minutes of the Trustees, and copies of such plan shall be distributed to the Union and to each Employer.

The Trustees may amend such plan from time to time, provided that such amendments comply with the purposes above stated. A copy of each such amendment shall be adopted and filed by the Trustees, and copies thereof shall be distributed to the Union and Employers.

. . . . .

Article III, Section 5 provides in pertinent part as follows:

Section 5. The Trustees shall use and apply the Pension Trust fund for the following purposes.

(a) To pay or provide for the payment of all reasonable and necessary expense of collecting the Employer Contributions and administering the affairs of the Pension Trust Fund . . ..

(b) To pay or provide for the payment of retirement or other benefits to eligible Employees in accordance with the terms, provisions and conditions of the pension plan to be formulated and agreed upon hereunder.

The pension plan at issue in its most recent form (R–2) was promulgated in June, 1971 and continued with amendments to November 30, 1975. At the time of its adoption, the board of trustees of the fund consisted, pursuant to Article IV of the

trust agreement, of five "employer trustees" and three "union trustees." Each group had one vote. (Article V, Section 9) The trustees at the time of the adoption of R–2 were Seymour Hayman, Ezra Kotcher, Kelly Marx, Alvin Rockoff and William Tanis, for the employers, and Lawrence McGinley, Anthony Iorio and Edward Hutnick for the union.

R–2 bears the names of the trustees, their legal counsel, the fund's consultant and actuary and the fund manager. The booklet begins with the text of a letter on the letterhead of the fund, which reads in pertinent part as follows:

To All Covered Employees:

We are pleased to present you with this revised and up-dated booklet *which describes your benefits and rights thereto under your Pension Plan.*

. . . . .

We urge that you read this booklet carefully and keep it in a safe place for future reference. . . .

Sincerely,

BOARD OF TRUSTEES

(emphasis added)

Immediately after the cover letter appears a question-and-answer section introduced by the following statement:

The following Question and Answer Section *is intended to highlight the main provisions of the Plan.* For detailed information concerning any specific problem you should contact either the Union or Fund Office.

(emphasis added)

The question-and-answer section includes the following text, at page 11:

Q. *How long will an employee receive his Pension?*

A. *Pensions awarded by the Board of Trustees,* other than Disability Pensions, *are payable for the lifetime of the Pensioner. If you have been awarded benefits and you die before 60 monthly payments have been made, your beneficiary will receive the remainder of the 60 payments. If your beneficiary is your wife she will receive an additional 60 monthly payments after the first 60 have been exhausted.* This does not apply to Disability Pensioners.

(emphasis in answer added)

The question-and-answer section also includes the following text, at pages 12 and 13:

Q. *Can I work at all while receiving benefits from the Pension Fund?*

A. Yes, you may work at any job other than one in the Milk, Milk By-Products, Ice Cream and Orange Juice Industries, and continue to receive a pension.

If you do work in these Industries, pension payments will immediately cease, all credited service will be cancelled and you will thereafter not be covered by the Pension Plan.

. . . . .

Q. *Can I return to work in the Industries after retiring on a Pension?*

A. No. You will lose all rights to your pension if you return to work after retiring. . . .

The following text appears in a box at the end of the question-and-answer section, at page 13:

This section contains a brief and general description of the Plan but it should not be interpreted as the document by which eligibility and benefits are determined. *To be fully aware of your rights and obligations under the plan you should read the Pension Plan itself, which appears on the following pages.*

. . . . .

(emphasis added) .

The Pension Plan appears on pages 14–35 of R–2. The fund manager, Eleanor Testa Cassie, testified that R–2 was sent to each new covered employee upon notification to the fund office by the employer that the employee had been hired. (Tr. 6/17/76: 15)

Article III of the pension plan (R–2) is entitled "Retirement Ages and Amount of Service." Sections 1, 2, 3, 5, 6 and 6–A describe the conditions under which various

types of pensions[2] are awarded, and the benefits to be paid when those conditions are met. This text remained unaltered after the December 1, 1973 amendments, except for increased benefits as indicated on the gummed insert to R–2.

Each enumerated section of Article III, after describing the age and service conditions under which a particular type of pension would be awarded, concludes with the following language: "shall receive on retirement a pension *for his lifetime*" or "may voluntarily retire at a pension of _____ *for his lifetime.*" (emphasis added) The language of the pension plan itself thus accords with the question-and-answer text at page 11 of R–2.

Similarly, Article III, Section 7 is entitled "Pension Guarantee" and comports with the question-and-answer text at page 11:

If a Pensioner receiving a pension other than a Disability Pension shall die within the five (5) year period beginning with the effective date of his pension benefits, then the monthly pension benefit to which he was entitled shall become payable to his designated beneficiary for the remainder of the said five (5) year period, and shall thereupon cease. . . .

If the Pensioner's spouse has been designated as the beneficiary and if at the end of said five (5) year period the Pensioner's spouse survives, the monthly pension benefit to which the Pensioner was entitled shall be continued for an additional five (5) years to said spouse but not to exceed the lifetime of the spouse.

Article V of R–2 is entitled "Payment of Pension." Section 1 of Article V is entitled "Monthly Installments," and provides as follows:

Each pension shall be paid in monthly installments starting with the effective retirement date and ending with the payment made on the first day of the month in which the death of the pensioner occurs.

This section thus comports with the promised lifetime pension term provided in the

question-and-answer text at page 11 of R–2 and the cited sections of Article III.

Section 3 of Article V is entitled "Retirement Defined." It provides as follows:

(a) Retirement under this Plan shall mean complete withdrawal from employment or self-employment in the Milk, Milk By-Products, Ice Cream and Orange Juice Industries in any capacity and anywhere in the United States.

(b) If a Pensioner breaks his retirement by engaging in employment or self-employment of the type described in subsection (a) above, except in accordance with Article IV, Section 4 [permitting return after receipt of disability pension benefits], pension payments shall immediately cease, all credited service shall be cancelled and the Pensioner shall thereafter be not covered by this Pension Plan.

This section thus accords with the question-and-answer text at pages 12 and 13 of R–2.

Article XII of R–2, entitled "Statement of Policy," provides in pertinent part as follows:

It shall be the policy of the Trustees to devote the full amount of contributions to the Pension Fund, less administrative expenses, to the payment of pensions for eligible employees. In determining the amount of pensions to be paid it is, and will continue to be, the policy to make such payments on an actuarially sound basis, as the same may be determined by the Trustees upon the advice of the Trust's actuary, pension consultant, and legal counsel, keeping in reserve adequate funds to meet commitments to employees who retire and to meet payments due in future years to those who may retire subsequently. In no event, however, shall the pension payments to employees who have retired be reduced. . . .

## II. The Contentions of the Parties

a. *The receiver.*

The receiver contends that "[t]he determination of employer liability to the Fund and its beneficiaries is governed and con-

---

2. The six types of pensions are normal pension, reduced pension, early retirement pension, 30- year pension, 35-year pension and 25-year pension.

trolled by the Pension Plan, collective bargaining agreements and the Agreement and Declaration of Trust." (Proposed conclusions of law, ¶ 1) He further contends that all corporate defendants except Johanna Farms, Inc. were parties to both the collective bargaining agreements and the trust agreement, and are bound thereby. (Proposed conclusions of law, ¶ 3) He further argues that "[t]he corporate defendants adopted, ratified and permitted the distribution of the Pension Plan and explanatory material contained in the Pension Plan pamphlets to all employees as well as third parties such as the Internal Revenue Service and are bound thereby." (Proposed conclusions of law, ¶ 4)

The receiver contends, therefore, that since the documents by which he claims the corporate defendants are bound clearly state the promise of a lifetime pension for employees who retire under the terms and conditions set forth therein, the employers are liable for such further contributions to the fund as are necessary to continue each pensioner's benefits in accordance with the promises made to him at the time he elected to retire.

b. *Plaintiffs Charles W. Silvey, Patrick J. Diegnan, and other individual pensioners.*

These plaintiffs, who have filed a separate complaint in this matter, have submitted the following proposed conclusions of law, *inter alia*:

1. Receiver's Exhibit R–1, the Agreement and Declaration of Trust, is a valid and existing contract.

2. Receiver's Exhibit R–2, Pension Plan-Milk Industry-Local 680, was published with the knowledge and consent of the employers and in accordance with the provisions of Receiver's Exhibit R–1.

3. The employees who are now pensioners had a right to rely upon R–1 and R–2 and other representations made by their employers and the Trustees of the Pension Fund to the same effect.

4. Each of the pensioners' pensions became vested immediately upon his retirement and qualification and his pension was not subject to change thereafter.

5. Pensioners were no longer member [sic] of the Union after retirement and were not represented in any Union negotiations conducted after their retirement.

6. The employers are estopped from denying the representations made to the employees by the Board of Trustees of the Pension Fund by the publication of R–2.

. . . .

9. As to each pensioner, his right to receive his lifetime pension became vested as of the date of his retirement and qualification.

10. The knowledge of the employer Trustees regarding representations made to the U.S. Government, employees and pensioners regarding the payment of "lifetime" pensions is imputed to the employers represented, and they are estopped from denying said representations and the employee pensioners were entitled to rely thereon.

c. *Defendants All Star Dairies, Inc.; Clinton Milk Co.; Fair Lawn Dairies; Farmland Fair Lawn Dairies; Garden State Farms, Inc.; Ideal Dairy Farms; Ideal Farms, Inc.; Lotz Brothers Dairy; Tilton Dairy Farms.*

The position of these defendant employers, hereinafter referred to as All-Star, has been set forth in proposed findings of fact and conclusions of law in which defendants Gannon Brothers, Kudile Brothers, Alderney Dairy Co., Inc., Dairylea Cooperative, Inc., and the defendant "employer trustees" join, and in which defendants Tuscan Dairy Farms, Inc. and O'Dowd's Dairy join with additions. The primary conclusions of law asserted by these defendants are as follows:

1. Each pensioner who retired prior to the November 30, 1975 termination of the pension plan has a vested right only in

the share of the fund's assets as of that date to which he is entitled under the schedule of priorities contained in the agreement and declaration of trust.

 A. Upon the termination of a collectively bargained pension plan such as the plan before the Court, the vested rights of retirees are limited to the assets in the fund on the date of termination.

 B. The defendant employers never expanded the vested rights of the pensioners by expressly guaranteeing in the collective bargaining agreements the payment of full monthly benefit levels for the pensioners' lifetimes.

Proposed findings of fact and conclusions of law, at 24–33.

Defendant O'Dowd's Dairy also contends that it did not divert contributions from the Local 680 fund into any other pension fund, since it negotiated a separate agreement with the union effective November 30, 1975, and that it breached no obligation created by the collective bargaining agreements and the agreement and declaration of trust in effect before November 30, 1975. O'Dowd's further contends that the plaintiff pensioners, and presumably the receiver, have failed to sustain their burden of proof that O'Dowd's received R–2 and other pension plan booklets or that O'Dowd's was aware of the question-and-answer text included in R–2 and other booklets. O'Dowd's further argues that plaintiffs and the receiver have failed to carry their burden of proof that O'Dowd's "in any way made or participated in making a promise or representation to anyone concerning the benefits of the Plan." Finally, O'Dowd's contends that "[t]he pleadings do not encompass the relief sought in this matter." (Proposed conclusions of law, ¶¶ 1–3)

Defendant Tuscan makes the following additional legal contentions, *inter alia*:

 1. That it was permitted by virtue of a proper arbitration award in its favor, based on the "most favored nations" clause of the collective bargaining agreement, to establish its own company pension plan.

 2. That the creation of this company pension plan predated the collective bargaining agreement effective November 30, 1975.

 3. That its negotiations with the union in November and December, 1975 were held separately from those of the other defendant employers.

 4. That it fully contributed all funds required by the collective bargaining agreements to which it was party.

 5. That "[t]he Arbitration Award received by Tuscan is a separate and independent basis on which Tuscan was no longer required to contribute to the industry pension fund. As such, Tuscan owes no duty, contractual or otherwise, to contribute to the industry pension fund."

 6. That "[t]he pleadings to [sic] not encompass the relief sought in the instant matter."

Proposed additional conclusions of law, ¶¶ 1–3, 5–7.

### d. Defendant Johanna Farms, Inc.

Defendant Johanna contends that it was never a party to any collective bargaining agreement or trust agreement pursuant to which the fund was organized or which provided for participation in or contributions to the fund. It further contends that it never made such contributions, and that its employees were and are covered under a separate private pension plan since May, 1962. Its employees, according to Johanna, have never been covered under or received benefits from the fund. It further contends that it has never engaged in a conspiracy with Alderney, as alleged in the complaint, to avoid making required pension contributions to the fund. Accordingly, defendant Johanna renews its motion to dismiss the complaint. (Proposed conclusions of law, ¶¶ 1–5)

### e. Defendant Borden, Inc.

The following contentions are distilled from Borden's lengthy proposed conclusions of law:

 1. Borden did not execute any new collective bargaining agreement altering the

rights of any pensioner once it had ceased milk operations in New Jersey.

2. The last collective bargaining agreement executed by Borden as to its Newark operation was the 1965–1967 agreement, and as to its Trenton operation the 1967–1969 agreement. Since its contributions to the fund were based upon hours worked by employees, it had no obligation to make contributions after it no longer had employees working.

3. Borden has no continuing obligation under the trust agreement or under any collective bargaining agreement to make additional payments to the Local 680 fund. Article VII, Section 4 of the trust agreement is not to the contrary.

4. "The extent of Borden's agreement was to make a cents per hour contribution based upon hours work of its employees for the duration of the then current collective bargaining agreement. An employer who makes that kind of an agreement does not agree to contribute sufficient assets to cover the costs of the pension benefits for their [sic] former employees."

5. "Borden, by agreeing to make a cents per hour contribution has by that expression alone limited the extent of its obligation to the dollar value of the amount required to be contributed by the terms of the collective bargaining agreement and for the duration of the then current collective bargaining agreement."

6. In addition, various collective bargaining agreements specifically disclaimed any guarantee of benefits.

7. "Borden does not have an obligation under the Trustees' pension plan booklet to pay pension benefits for the lifetime of a pensioner. Borden's obligations to the Local 680 Trust Fund were limited by the instruments, i. e. the 1962 Trust Agreement and the collective bargaining agreements, which created the trust fund and defined Borden's obligation to make contributions to the trust fund."

8. The deficiency in the contention that the pension plan and the question-and-answer text in R–2 provide a basis for the conclusion that the pensioners are entitled to lifetime pensions "is that the pension plan and for that matter the questions and answers set forth in the Pension . . . Plan Booklet [R–2], at best, describe the manner in which the trustees, as fiduciaries, were to expend the funds. . . . The extent of the employer's obligation to make contributions to the trust fund is, however, determined by the collective bargaining agreement not the Pension . . . Plan Booklet."

9. "As previously stated, Borden's obligation was to pay a cents per hour contribution based upon hours worked of its employees during the term of the then current collective bargaining agreement. Borden has discharged all of its obligations as a matter of law."

Proposed findings of fact and conclusions of law, at 7–16.

### III. Factual Analysis

■ The Court finds, from careful examination of the many documents and massive testimony in this case, that the only reasonable interpretation of the governing documents of the pension plan—the collective bargaining agreement, the agreement and declaration of trust, and the pension plan adopted pursuant thereto—is that each employee was offered a stated pension for life. As the Court will detail in its discussion of the evidence, the very contributions which the defendant employers contend are the limits of their liability were calculated in terms of actuarial assumptions of the projected life spans of the number of employees who could be expected to elect to become pensioners during each collective bargaining period. Furthermore, the board of trustees on which the employers would have the Court place full and exclusive responsibility for the clear and consistent representations in the pension plan that the pension payments would continue for the life of the pensioner was composed, by a substantial majority, of officers of the defendant employers who were often also the employer negotiators of each new collective bargaining agreement. In light of the substantial evidence, presented by the employ-

ers themselves, of joint preparation for and participation in the collective bargaining process by all the members of the employer negotiating group, the Court rejects as a matter of credibility all testimony claiming that the employers were unaware of the provisions of the pension plan for which they so actively and carefully negotiated changes in contributions and benefits every two years.

■ The Court concludes that each two-year collective bargaining agreement, and the pension plan in existence pursuant to each agreement, constituted an offer to any employee who was qualified for retirement under that plan that he could accept by retiring during the term of the agreement. Once an employee took that action, the offer-and-acceptance required to constitute a contractual obligation was complete. The employee-pensioner's rights were fixed according to the terms and conditions of the collective bargaining agreement and pension plan in effect at the time he retired. No pensioner's benefits may be reduced by virtue of the provisions of a collective bargaining agreement executed after his retirement, when he was no longer a union member and therefore unrepresented at the negotiations.[3]

The Court turns first to the testimony of Thomas W. Fitzgerald, vice-president of the Martin E. Segal Company, actuarial consultants to the fund. Mr. Fitzgerald testified that Martin Segal's function was to "analyze the experience of the Fund with respect to income, investment income, as well as contribution income, the changes or the modifications in the composition of the membership, the trends toward retirement, and trends toward increasing the number of participants, the trends in decreasing the numbers. Then we make an actuarial assumption as to what we anticipate will be happening over the future course of this program and then we make determinations as to what the contribution rates must be in

order to keep the Fund on a properly-funded basis." (Tr. 5/27/76: 91)

Later in this testimony, Fitzgerald was asked whether he regarded the question-and-answer text in R–2 providing for lifetime pension benefits to be accurate. He testified:

THE WITNESS: Well, I regard them as accurate in this respect, your Honor. I think that the plan says they shall be entitled to a lifetime pension, but I don't read that to be a guarantee that the money will be there. This is the point I'm trying to raise. In other words, *they are entitled to a lifetime benefit because all of our calculations are made on the premise that the individual is going to receive it on a lifetime basis.*

THE COURT: What do you mean by all your calculations are made on that premise. Is that the calculation which you used for the purpose of the Collective Bargaining Agreements?

THE WITNESS: Yes, sir.

· · · · ·

THE COURT: Are those calculations based on how much money must be contributed to give any person who retires during the lifetime of the agreement a pension for his lifetime or a pension only for the life of the agreement?

THE WITNESS: *The cost* of the program or the benefits that they are asking *is predicated on the assumption that this program will be going on continuously and that the benefit would be paid during the lifetime of the individual.*

Tr. 6/17/76: 99–101 (emphasis added).

The employers' contention that they bear no liability for pensions beyond the life of any collective bargaining agreement which requires them to make contributions to the fund is effectively undercut by the follow-

---

**3.** It also appears that no pensioner has received increased monthly pension payments by virtue of subsequent collective bargaining agreements which increased the monthly pension to be received by employees retiring during their term. (Pensioners' Proposed Findings of Fact, ¶¶ 5–8. *See* R–2, Articles III, XI.)

ing testimony by Fitzgerald elicited by counsel for the "employer trustees:"

> Q: In determining the number—the amount of benefits that will have to be paid out from now until this fund is permitted to last, however long that may be, did you make any projections based on the ages of the pensioners as to how many deaths might occur in this future period?
>
> A: Yes.

Tr. 5/27/76: 122. Indeed, a statement by the same counsel for the "employer trustees" during his questioning of Fitzgerald on March 12, 1975 reflects his own conception of the fund as providing pension benefits for the lifetime of the pensioner:

> How do you determine the amount that you want or if you are back? That is where the nature of the employment of the current pensioners becomes very relevant. If the employer by whom a current pensioner was employed for most of his time is defunct, that is a liability. Whatever the actuarial—*whatever the dollar amount is needed to fund the pension for that man for his remaining life expectancy.* He's now 63. Under the tables he can be expected to live to 78. His pension benefit is 300 a month. *Actuarial computation is then made to determine what dollar amount the unfunded liability is needed to take care of that man.*

Tr. 3/12/75: 43 (emphasis added).

Counsel for defendants Gannon and Kudile reached the same conclusion in colloquy with the Court:

> THE COURT: Is there any doubt in your mind as to what anyone in the entire industry would understand as of the day they put in their retirement papers under this contract?
>
> MR. CHASE: I would assume they would think they were getting a pension for life.
>
> THE COURT: There would be no reasonable expectation of otherwise on their part, would there?
>
> MR. CHASE: I would assume not.

Tr. 6/16/75: 64–65. Counsel retracted these statements the following day. (Tr. 6/17/76: 3–4) Of course, the statements and concessions of counsel are not evidence, and the Court had not considered them as such.

Vincent Apruzzese, Esquire, counsel to the Milk Industry Association during the 1969 collective bargaining negotiations with Local 680, was shown a document which purported to represent the changes in the prior collective bargaining agreement agreed to in the 1969 negotiations. (Tr. 8/9/76: 20) In his testimony he made reference to the document which has been marked DAS–2, and acknowledged that the agreement reached between the parties as of November 20, 1969 contained the following language:

> 3. Pensions
>
> (a) Increase contribution rate by amount necessary to safeguard fund ($2.32)

DAS–2, at 2, ¶ 3(a). Tr. 8/9/76: 20. Apruzzese confirmed that Fitzgerald's prior testimony, that the level of contributions to the fund was computed on the basis of a projection of the number of employees who would retire during the term of the agreement in terms of the goal of affording each such employee a pension for his projected lifetime, was correct. (Tr. 8/9/76: 22–23) The Court and the witness then had the following colloquy:

> [THE COURT]: Then we speak then of safeguarding the Fund, as you do in your memorandum, were you referring then to how much money would be necessary to be contributed so that any individual employee who retired during the lifetime of the Fund would be guaranteed his particular pension for his lifetime?
>
> [THE WITNESS]: My answer to that, your Honor, would be that it did not occur to me that the language "safeguard" would mean "guarantee." The reason I say that is any time you negotiated a Pension Fund you try to make certain the contribution and what the Fund will provide is actuarily [sic]

sound. This advise [sic] is ordinarily taken from an actuary. So that whether or not the word "safeguard" means "guarantee," if you are asking me that question, it would be my reaction that it doesn't necessarily mean "guarantee."

Tr. 8/9/76: 23. This testimony reaffirms that all negotiations and calculations of employee benefits and employer contributions were based on the fact that the pension benefits were designed to endure for the lifetime of the pensioner, and that this proposition was the basis upon which employers, union officials and prospective pensioners conducted their dealings with each other.

Defendants called Marc Gertner, Esquire, an Ohio attorney whom the Court found qualified as an expert in the field of pension plans. (Tr. 8/9/76: 150) Gertner testified that there were three general categories of pension plans: defined benefit, defined contribution, and hybrid defined benefit-defined contribution. (Tr. 8/9/76: 152) He testified:

The typical Taft-Hartley plan [pursuant to 29 U.S.C. § 186(c)(5)], arising out of collective bargaining, multi-employer plan, is a hybrid. It is both defined contribution and defined benefit. It is defined contribution in that the obligation to make contributions arises out of the collective bargaining agreement between the parties and that sets the obligation. It is defined benefit to the extent that *the nature of the bargain process is that the employees who are giving up from a wage package want to know what benefits they will receive.*

So that the pension plan, as opposed to the collective bargaining agreement, which was the source of the obligation for contributions, the pension plan will define in some determinable [sense] what benefits are at a given point in time or times.

Tr. 8/9/76: 154 (emphasis added). Gertner identified the Local 680 plan as of the third category, the hybrid defined contribution-defined benefit pension plan. (Tr. 8/9/76:

158) When asked whether an employee retiring under such a plan would legitimately expect that his pension would be dependent on future collective bargaining agreements taking place after he has left the collective bargaining unit, Gertner testified:

THE WITNESS: *I'm sure that the expectation of the man who has served his thirty years and applied for and received his pension is that the money is already there pigeonholed, perhaps, so that he will continue to get a monthly payment for life*, depending upon the actuarial systems used and in the fundings *in fact he may be at the whim of subsequent negotiators* to continue the flow of moneys in via collective bargaining agreement language to continue to provide that benefit . . . .

THE COURT: Do you see a distinction between an employer failing in business and an employer voluntarily terminating the plan perhaps even with the knowledge and consent of the union?

. . . . .

THE WITNESS: I don't think it makes a difference because in either instance there will be no collective bargaining agreement required for future dollars to come in.

THE COURT: In other words, it is your testimony, then, as an expert that the promise made to the employee who retires really is that you shall have a pension of, let's say, hypothetically, $100 a month for life for the life of the present collective bargaining agreement.

THE WITNESS: Not necessarily. *You shall have a pension of $100 per month for life if there are sufficient assets in the pension trust today or hereafter to pay that money out.*

Tr. 8/9/76: 168–169 (emphasis added). No evidence has been produced to show that such a *caveat* was ever made known to any employee.

Though Gertner testified that under a hybrid defined contribution-defined benefit

plan, the obligation of the employers is defined solely by the collective bargaining agreement and the benefits to be received by the employees solely by the pension plan promulgated by the trustees (Tr. 8/9/76: 158), he admitted on cross-examination that such a division of documentary authority was not prerequisite to the existence of this category of plan:

Q: . . . [I]s there anything to prevent employers from agreeing that they will provide contributions necessary to afford the benefits which are provided in the plan?

A: Oh, no sir. If they agree to that, that's legal and proper.

Tr. 8/9/76: 180. *Cf.* Tr. 8/9/76: 211–212.

Gertner also testified with regard to the benefits enjoyed by the contributing employers under a hybrid defined contribution-defined benefit pension plan. He agreed that the administrative costs are less, and that an employer might gain in bargaining power with the union by participating in an industry-wide multi-employer pension plan. (Tr. 8/9/76: 188–190)

When Gertner's attention was directed to the portion of the collective bargaining agreement, R–14, Schedule F, ¶ 3(C), which reads "[t]he foregoing contributions shall provide for the benefits heretofore provided . . . ." (Tr. 8/9/76: 212), he testified:

A: In my opinion it is precatory because the legal responsibility to take contributions and then determine an award or establish the level of benefits is beyond the scope of the people who were parties to this agreement and, therefore although they use the word "shall" since they had neither the legal power nor authority to effect it, *it must be precatory* even though they use the word "shall" because it was beyond their legal capacity.

The rights to establish the pension plan, once the first bargaining agreement provided for it, flow out of the trust agreement to the trustees who are charged to establish and thereafter amend the plan.

Q: So that a pension beneficiary has to know that when his labor union enters into an agreement with his employer which says that he shall receive certain benefits, that although it says he shall receive them it doesn't really mean that? It really means that he might receive them and that really he might not; is that what you are telling us?

A: Yes, sir . . . . .

Tr. 8/9/76: 213–214 (emphasis added) This testimony highlights the essential difficulty in defendants' position: though they admit that the collective bargaining agreement could provide for a particular duration of benefits, they would have the Court interpret even the most mandatory language as merely precatory to avoid that result, because otherwise the collective bargaining agreement would be seen as providing for a particular duration of benefits. The circularity of that reasoning needs no elucidation.

Harold E. Grotta, Esquire, a New Jersey attorney, testified that he had represented the Milk Industry Association in five different collective bargaining negotiations with Local 680 over the past twelve years (Tr. 8/9/76: 288), including the 1971 negotiations. Grotta's account of the employers' goals at the 1971 negotiations sheds substantial light on the parties' contemporaneous view of their rights and liabilities under the existing pension plan.

Grotta testified that the employers sought to terminate the existing pension plan and to replace it with private pension plans, such as they had been informed had been negotiated between the union and Johanna Farms. (Tr. 8/9/76: 297) The witness gave the following testimony:

THE COURT: You mean the employers wanted to—wanted to pull out of this plan?

THE WITNESS: That was the first time in my recollection that there was a suggestion made at the bargaining table that we wanted the Johanna—we wanted the right to establish our own individual pension plans and terminate

the old. As a matter of fact, Mr. McGinley—

THE COURT: Why did you want that?

THE WITNESS: Because we assumed and we had a right to as it has been later proven—that *the cost to the companies would be substantially less.*

THE COURT: *Because they would be responsible —*

THE WITNESS: *Only for their own employees.*

THE COURT: *Whereas under the plan as it existed, what was their responsibility?*

THE WITNESS: *The actuarial figures that were being submitted to us by Fitzgerald's office in all those times envisioned past service credits for all of the people who have worked for the various companies.*

THE COURT: So it was your view, then, that under the existing plan the employers would become responsible for other employees of other companies?

THE WITNESS: No, the cost—we understood that the way he arrived at the cost to us included funding some of that.

THE COURT: In other words, *the employer would be winding up paying for the employees—past retired employees of other companies which may go out of existence.*

THE WITNESS: *That was naturally included in the cost that was submitted to us of X cents per hour.*

THE COURT: Because you assumed that was a potential liability that you wished to get out of the multi-employer pension fund?

THE WITNESS: That's right.

Tr. 8/9/76: 298–299 (emphasis added).

According to Grotta's testimony, the issue of the extinction of the fund and the organization of private pension plans by each employer was again broached at the 1973 negotiations, first by Tuscan and then by all the employers. (Tr. 8/9/76: 324–325). Grotta testified that there was consideration of the effect of the termination of contributions to the plan on current pensioners:

THE WITNESS: I have a minute in my own handwriting of when we discussed this. All that we had there with respect to that was that we would investigate the cost so as to provide the pension plan providing the same benefits as presently to our present employees.

Tr. 8/9/76: 325. In other words, the only consideration given to the present pensioners was an analysis of what their current benefits cost in order to permit the employers to provide the same benefits to future pensioners under private plans. DAS–11E, admitted into evidence as part of DAS–11 (Tr. 8/9/76: 82), and read to the Court by counsel after Grotta gave this testimony, suggests that the employers were aware even then that termination would ultimately destroy the pension benefits of current pensioners. The letter, dated November 27, 1973, is from Thomas W. Fitzgerald of the Martin E. Segal Co. to Dan Wetlin of the Milk Industry Association. That text follows:

At your request we have calculated the impact on the Fund if all of the pensioners currently on the rolls as of March 31, 1973 were to be separated along with all of the assets of the Fund as of March 31, 1973. Based on present assumptions we estimate benefits could be paid to such pensioners at the same level they are currently receiving for a period of three years and four months.

For each multiple of 50 pensioners that would remain in the Fund, the current benefit level could be paid to the remaining pensioners for an additional month above the three years and four months.

The letter indicates that copies were sent to Anthony Iorio and Kenneth Glemby. Grotta testified further:

THE COURT: . . .

Was any proposal made as to what would happen once the Fund had been exhausted after the employers pulled out, what would happen on the pensions of those who had retired?

THE WITNESS: We didn't discuss it

. . . .

. . . It was the assumption certainly on my part, and I don't know whether we ever said it, that that is as long as the pensions would last.

THE COURT: That was unacceptable to the Union?

THE WITNESS: That was unacceptable to this extent, as I said before.

THE COURT: Did they tell you why it would be unacceptable?

THE WITNESS: They told us the same thing they told us when we negotiated in '75 when we asked to do it.

THE COURT: *What did they tell you?*

THE WITNESS: *They weren't going to sell their old people down the river. It was an economic necessity, they finally realized. There wasn't that much more money available.*

THE COURT: *What was the economic necessity?*

THE WITNESS: *For us to sever the plans and eliminate and terminate [this] one.*

Tr. 8/9/76: 326–328 (emphasis added).

Grotta next testified concerning the 1975 negotiations, at which the parties agreed to terminate the existing pension plan with no provision for the security of the current pensioners. Once again, the employers apparently raised the issue of plan termination. This time, however, neither side would initially concede the issue and a strike resulted:

THE COURT: They called a strike, didn't they?

THE WITNESS: We insisted on the termination and they had a strike.

THE COURT: The strike was called to protect the retired workers, was it?

THE WITNESS: The strike was called because we wanted to terminate the old plan.

THE COURT: It was called for what reason, to prevent that?

THE WITNESS: Because we were at an impasse in bargaining, that's right.

. . . . .

Because they were not willing to go along with the termination of the old plan.

. . . . .

THE COURT: They wouldn't sell their old people down the river?

THE WITNESS: In so may words, yes.

THE COURT: How long did the strike last?

THE WITNESS: I think it lasted only about a day.

THE COURT: What was the result of the strike?

THE WITNESS: The Union agreed that they would waive—agree to our proposal to terminate the old pension plan.

TR. 8/9/76: 328–330.

The economic consideration given to the active employees in exchange for the "economic necessity" of swording the old pension plan, according to Grotta's testimony, is reflected in the provisions of the new collective bargaining agreement signed in 1975. The active employees received higher employer contributions to the welfare fund, a $38 weekly raise over a two-year period, which was approximately a 7% salary increase, and each employer agreed to establish a new single-employer pension plan for its active employees which provided "benefits . . . identical to the benefits under the old plan" purportedly terminated by the 1975 agreement. In addition, the active employees were given full pension credits for the period worked under the old plan. (Tr. 8/9/76: 331–333) The employers, for their part, freed themselves of the burden of further contributions to ensure the pension security of their former employees who had retired before November 30, 1975 pursuant to the terms and conditions of the existing pension plan. (Tr. 8/9/76: 334)

Counsel for one of the defendant employers aptly summarized the purposes and the outcome of the November, 1975 negotiations:

MR. MILMAN: From a moral approach to the issue, what you have here is employers saving 40 cents an hour from a contribution of $1.24 down to a contribution of 84 cents, from the figures I have seen thrown around.

From what I understand it is as low as 60 cents an hour or 50 cents an hour. You have employers looking to save 60 or 70 cents an hour at the sake of throwing 1400 families to the wind. That is what you have. That's the position at the bargaining table.

. . . . .

THE COURT: So the present employees get a wage increase and the past employees no more contributions on their behalf? Is that it?

MR. MILMAN: In fact, that is what happened, yes.

Tr. 2/24/76: 41–42.

Grotta testified that a principal motivation of the employers in insisting on the termination of the fund in 1975 was the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, which created the Pension Benefit Guaranty Corporation. Grotta stated his view of the effect of the termination of the pension plan on a hypothetical employee who had retired on a 30-year pension in 1974:

THE WITNESS: Under the new plan he is covered [to] the extent that there are assets available in the Fund to take care of him for whatever period of time it will, except, of course, under the new Act, *and this is one of the reasons why it was absolutely in our opinion essential to bring this to a head at this particular time, because with the advent of ERISA, or, as you call it, the creation of the PBGC, the question of liabilities on the part of the companies might have been and in many instances were [sic] changed. Up to thirty per cent of their net worth.*

THE COURT: If this Fund kept in business until ERISA had to take the Fund over, the hypothetical milk driver who retired after thirty years would be ful-

ly protected, but in that event the milk companies would have had their assets depleted?

THE WITNESS: Might have been . . . . .

Tr. 8/9/76: 353 (emphasis added). *Cf.* 29 U.S.C. §§ 1362–1364, 1367–1368, which govern employer liability to the PBGC after the payment of termination benefits to the beneficiaries of a multi-employer plan. In other words, the employers felt it necessary to terminate the plan promptly to avoid the imposition of mandatory insurance, which could have resulted in their exposure to liability if the plan ultimately failed.

The final witness called by any party was Seymour Hayman, vice-president of defendants Gannon Brothers and Kudile Brothers, a member of the employers' negotiating committee for every contract between 1961 and 1975, and an "employer trustee" of the Fund from 1961 to the present. (Tr. 8/9/76: 369–370, 392) He testified that he was one of the employer negotiators who insisted on the termination of the existing fund in 1975 as a term of the new collective bargaining agreement. (Tr. 8/9/76: 374) Hayman testified further:

THE COURT: There has been testimony here that the fund of which you were a trustee could not endure more than a matter of some months or not more than certainly several years without continued payments into the fund. Were you aware of that?

THE WITNESS: Yes.

THE COURT: Now, the contract which was negotiated in 1975 provided for no further payments into the fund, is that right?

THE WITNESS: That is correct.

THE COURT: Did you understand at the time you negotiated that contract that that would be the effective end, within a matter of some months, of the fund of which you were a trustee?

THE WITNESS: Oh, yes.

Tr. 8/9/76: 375–376.

Hayman further testified that he was aware of the existence of R–2, the pension

plan booklet, and that though he was not particularly aware of the question-and-answer text in the booklet he had seen the booklets during his years as a trustee. (Tr. 8/9/76: 382–384) He testified that he was aware that R–2 had been printed, and that it contained a series of questions and answers, but that he was unaware of what the questions and answers were. (Tr. 8/9/76: 386–387) When confronted with the question-and-answer text from R–2 which states that a pensioner will receive his pension for his lifetime, Hayman maintained that "I didn't know that it was in that book." (Tr. 8/9/76: 388) He agreed that he had repeatedly taken the position, as a management negotiator at the same time that he was a fund trustee, that there was no guarantee of a pension for life. (*Id.*) He contended, however, that despite the fact that he was a trustee and that he knew of the existence of R–2, which was promulgated in the name of the trustees and bore his own name, he had never read R–2. (Tr. 8/9/76: 390) He conceded that the document was prepared by Martin Segal with the knowledge and approval of the trustees. (*Id.*) He admitted having been present at a meeting at which the trustees voted to approve payment of $1,531.40 from the trust for the printing of the pension plan booklets, on June 8, 1967. (R–98) Hayman testified:

Q: When you voted in favor of paying for a part of the printing of that booklet, did you do so not knowing what was in it and that it was representing the things that you as a member of the Board of Trustees wanted your pension beneficiaries to know?

A: Yes, that's exactly what I did.

Tr. 8/9/76: 398–399.

Hayman testified that he did not view his duty as a trustee to include any obligation to inform the pensioners with regard to their rights or the benefits to which they were entitled under the plan:

THE WITNESS: I didn't think of it as part of my duties to inform them in any fashion as to various rights. I felt my duty was, to be repetitious, to dispense the funds that I had. I felt my duty was limited to that.

Tr. 8/9/76: 400–401. Nevertheless, according to his testimony, Hayman recognized his fiduciary duty to the fund's beneficiaries:

THE COURT: . . . Did you understand that when you were a trustee of that fund you were to function only as a representative of the beneficiaries of the fund?

THE WITNESS: Yes.

THE COURT: With no loyalty to any other cause or person?

THE WITNESS: Yes.

Tr. 8/9/76: 402.

He denied ever having been faced with a situation during his more than 14 years as a trustee in which acting in the best interests of the beneficiaries would hurt his company. (Tr. 8/9/76: 402) He testified:

THE COURT: . . . Did you understand when you advocated termination of the fund you were advocating something against the interests of the beneficiaries?

THE WITNESS: No, sir, I didn't.

THE COURT: . . . You thought it was in the interest of those drawing pensions under the fund to terminate.

THE WITNESS: Yes, sir, I did.

THE COURT: In other words, a retired milk driver would be better off before the collective bargaining agreement of '75 or otherwise?

THE WITNESS: He could very well have been, yes, sir.

Tr. 8/9/76: 404. Hayman explained that at various meetings with representatives of the PBGC he and other trustees had been informed that if employer contributions to the fund were continued until January 1978 the PBGC might consider the fund to be in a "planned bankruptcy" and therefore not eligible for mandatory termination benefits at that time. (Tr. 8/9/76: 405) Of course, the testimony of the employers' collective bargaining counsel, Harold Grotta, estab-

lishes that the employers were well aware that termination in 1975 would effectively insulate them from any liability to the PBGC because it would prevent any chance of PBGC termination benefits at any time, whether before or after January 1, 1978. (Tr. 8/9/76: 406–407)

Hayman contended throughout his testimony that his decision to seek termination of the fund in 1975 was for the benefit of the pensioners and not for the benefit of his companies. (Tr. 8/9/76: 407) Yet he admitted that he was aware of the potential liability to the PBGC which ERISA might impose on his companies if plan termination benefits were granted. He denied, however, that it played any role in his decision to advocate the termination of the fund, though he was "concerned with it." (Tr. 8/9/76: 411–412) He knew that he would incur no liability to the PBGC if the PBGC did not insure the termination of the plan. (Tr. 8/9/76: 412)

█ The Court rejects that portion of the Hayman testimony in which the witness maintained his ignorance of the content of the pension plan itself and the pension plan booklet, R–2. This witness has been both an employer negotiator and an "employer trustee" without interruption since the very inception of the fund. The Court has heard exhaustive testimony concerning the detailed, painstaking collective bargaining negotiations which preceded the signing of new collective bargaining agreements at two-year intervals during that period. The Court paid close attention to the content and quality of the Hayman testimony, and the manner in which it was given, and must reject the witness' assertions of ignorance.[4]

### IV. Legal Analysis

The Court's legal inquiry is in two parts. The first question is whether the pensioners have any vested right to a pension. If they do, the Court must determine whether those vested rights attach only to such monies as are in the fund, as the defendant employers contend, or whether the retired employees have a vested right to a pension for life.

*a. Do the pensioners have a vested right?*

█ Though pension and welfare funds must comply with certain federal requirements, *e. g.*, 29 U.S.C. § 302(c)(5), they are created under and otherwise governed by state law. *Craig v. Bemis Co., Inc.*, 517 F.2d 677, 680 (5th Cir. 1975); *Miller v. Davis*, 507 F.2d 308, 311 n.3 (6th Cir. 1974). Since the instant fund was created under New Jersey law, the law of this State governs the question whether the pension rights of the retired employees have vested.

In *Stopford v. Boonton Molding Co.*, 56 N.J. 169, 265 A.2d 657 (1970), the New Jersey Supreme Court summarized the New Jersey view of pension rights:

> The contributory pension plan involved here is not a mere gratuity, the benefits of which depend upon the bounty of the employer. It is an offer to pay a pension upon compliance by the employee with terms and conditions set forth therein. . . . Satisfaction of those requirements constituted adequate consideration and brought about a vesting of the right to the lifetime benefits as prescribed by the plan.

56 N.J. at 183–184, 265 A.2d 657, 664. Though *Stopford* involved a pension plan to which employees as well as their employer contributed, its general statement of New Jersey law is equally relevant here.

█ There can be no question that the rights of pensioners who retired in compliance with all the terms and conditions of the governing pension plan and who are already receiving benefits are vested, within the meaning of state law. Indeed, the employers do not contend otherwise. Their

---

4. The Court must observe, as well, that this testimony confirms the necessity of the order appointing a receiver for the fund. Indeed, there is more in the record today to support the Court's reluctant action than the Court could have conceived would ever be produced at the time the order was entered some five and one-half months ago. Whether this record also establishes a breach of fiduciary duty by one or more trustees is, however, not now before this Court for determination.

contention concerns only the extent of the pensioners' vested rights.

■ In New Jersey, an employee's pension rights may not be altered after they vest upon his retirement:

> When an eligible member retires from his employment and ceases to be an active member of the union his vested rights in the Fund cannot be diminished or destroyed. [citations omitted] By the same token, such pension rights as are vested on the date of retirement constitute the full measure of any member's entitlement. In the absence of any specific provision either in a collective bargaining agreement or the trust agreement itself creating a right to an increase in benefits, those members of Local # 13 who retired prior to January 1, 1973 are entitled to receive only those benefits which had previously vested in them and no more.

Thompson v. Sheet Metal Workers Local Union No. 13, 132 N.J.Super. 348, 333 A.2d 572, 576 (Ch. 1975) (emphasis added). The federal rule is similar:

> Since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer.
>
> · · ·
>
> This does not mean that when a union bargains for retirees—which nothing in this opinion precludes if the employer agrees—the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. See generally Note, 70 Col.L.Rev. 909, 916–920 (1970). The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed. See Smith v. Evening News Assn., 371 U.S. 195, 200–201

[83 S.Ct. 267, 270–271, 9 L.Ed.2d 246] (1962); Lewis v. Benedict Coal Corp., 361 U.S. 459, 470 [80 S.Ct. 489, 495, 4 L.Ed.2d 442] (1960). (emphasis added). Allied Chemical & Alkali Workers, Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n.20, 92 S.Ct. 383, 398, 30 L.Ed.2d 341 (1971). Cf. Toensing v. Brown, 528 F.2d 69, 72 (9th Cir. 1975) (no violation of trustees' duty in awarding larger increase in pension benefits to active employees than to retirees); Kiser v. Huge, 170 U.S.App.D.C. 407, 517 F.2d 1237, 1246 (1974) and Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950, 170 U.S.App.D.C. 437, 517 F.2d 1267, 1270 (1974), decided together and left undisturbed in pertinent part by Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950, 170 U.S.App.D.C. 444, 517 F.2d 1275, 1279 (1975) (en banc) (retiree who meets eligibility requirements in effect at time he files his application acquires vested right to pension benefits that survives any subsequent attempt by trustees to alter eligibility requirements).

The Court therefore finds that each retiree acquired a vested right to his pension upon his retirement, which could be neither diminished nor destroyed.

b. What is the extent of the pensioners' vested right?

The Court now turns to the question of the definition of the pension to which each retiree has a vested right.

■ It is the conclusion of the Court that the collective bargaining agreements, trust agreements and pension plans adopted by the parties, and by the trustees pursuant to authority granted them by the parties, since the inception of the fund in 1962, have uniformly extended to each qualifying employee the promise of a pension for life.[5]

---

5. The Court reaches this conclusion without reference to any language in certain of these documents relating to the presence or absence of a "guarantee." As the Court noted earlier, supra at 1–2, the issue of "scrivener's error" is irrelevant to the Court's determination here. After hearing the testimony of the negotiators the Court has found as a matter of fact that the "without guarantee" language, when it did appear, was not intended to limit the duration of benefits to something less than life, but rather to provide against the possibility of actuarial error in the computation of the level of benefits. It is therefore immaterial whether the

It is true, as the defendant employers point out, that there is no language in the collective bargaining agreements or in the trust agreement which explicitly guarantees a pension for life. On the other hand, there is nothing in either document expressly limiting pensions to the life of the agreement. The employers contend that since they signed only the collective bargaining agreement and the trust agreement, and since the pension plan was promulgated solely by the trustees, the employers are insulated from any liability to make good on the lifetime pension admittedly promised by the pension plan since its inception. (R–6, at 43–45; R–5, at 42–44; R–2, at 19–22)

The Court rejects that proposition. It was the employers who agreed to supply the money, in contributions calculated on the basis of a lifetime pension term, to fund the pension established by the plan pursuant to the trust agreement and the collective bargaining agreements. The record is replete with evidence of trustee conflict of interest, particularly among the "employer trustees," and throughout the life of the fund virtually all of the "employer trustees" were officers of the defendant employers. (Schedule A filed herein, submitted by the receiver to the Court without objection, August 19, 1976, pursuant to Tr. 8/9/76: 265–267. *Cf.* Grotta, Tr. 8/9/76: 313–314, 334–335; Hayman, Tr. 8/9/76: 382, 394–395.) That the roster of union trustees bears a similar relationship to the union officers does not diminish the close connection between the "employer trustees" and the employers. (Schedule B, submitted and filed as was Schedule A, *supra; cf.* Tr. 8/9/76: 418–419)

This Court cannot hold that these individuals who were both bargaining representatives of the employers and fiduciary trustees of the beneficiaries, could with one hand promise a lifetime pension and with the other limit that promise merely to the lifetime of the collective bargaining agreement. Though the legal framework of the

fund and its relationship to the collective bargaining parties were purportedly constructed to prevent the assumption of responsibility by the employers for the representations made to the employees, a court of equity will not permit the reasonable and justified expectations of those employees, knowingly wielded by the employers for whom they labored for so many years, to be frustrated in this manner.

The Court notes that the promise of a lifetime pension is extended not only in so many words, but is necessarily implied in several other provisions of the pension plan. The benefits to be received by spouses and other beneficiaries of a deceased pensioner specifically extend beyond the two-year scope of any given collective bargaining agreement, which would be the maximum duration allowable under the employers' approach. Even more telling is the reciprocal condition of the receipt of a lifetime pension under the plan—that the pensioner agree to refrain from further employment in the industry *for the rest of his life.* These are not the provisions of a plan which contemplates a pension for a maximum period of two years.

The employers contend that even if a lifetime pension was promised, it was conditioned on the availability of adequate monies in the fund from which it could be paid. Of course nothing prevents employers from specifically limiting their liability under a multi-employer plan to the specific contributions to be made by them on a per-hour basis for the life of each collective bargaining agreement, provided that this limitation is the express intention and understanding of the parties. To give effect to such a limitation now, however, after fourteen years of consistent representations to the employees that the pension for which their union had given up current benefits would be for life, *cf. Craig v. Bemis Co., Inc.,* 517 F.2d 677, 680 (5th Cir. 1975), and after hundreds of workers had elected to retire and to refrain from further work in the industry in reliance on this promise,

words were delegated purposefully or by accident, although the Court has found for the

record that they were deliberately bargained away.

is unconscionable. This Court finds as a fact that the members of the Milk Industry Association knew that the pension plans promulgated pursuant to the collective bargaining agreements they negotiated and signed provided for lifetime pensions. They knew as well, as demonstrated in 1971 when they first sought the destruction of the fund, that termination of the plan would leave the pensioners without financial security in their declining years. In 1975, when they finally succeeded in "persuading" the union, in the apt terms chosen by then-counsel to the employers, to "sell [its] old people down the river" (Tr. 8/9/76: 327), they knew that at the expense of the pensioners' future security they would gain the assurance that their companies would never be forced to indemnify the Government for the protection of the pensioners' livelihood.

The cases submitted by defendants stand for the proposition that a retired employee's vested right to his pension upon termination of a plan extends only to the available fund created by employer contributions required by the collective bargaining agreement, to be distributed according to the termination provisions of the trust agreement. Each case, however, involved the *future* pension rights of *current* employees of an employer which went out of business or closed down. *See, e. g., Hauser v. Farwell, Ozmun, Kirk & Co.,* 299 F.Supp. 387 (D.Minn.1969) (liquidation of particular division of company); *Baake v. General American Transportation Corp.,* 351 F.Supp. 962 (N.D.Ill.1972) (closing of particular company facility); *BOSI v. USM Corp.,* 90 LRRM 2867 (D.N.J.1975) (closing of particular plant). None involved the elimination of the *vested* pensions of *retired* employees already receiving benefits, where the contributing employers remained in business as before.

■ *Boase v. Lee Rubber & Tire Co.,* 437 F.2d 527 (3rd Cir. 1970) is also inapposite. That case involved a single-employer pension plan, and a trust agreement which provided that "the trusts hereby created are purely voluntary on the part of the Compa-

ny, and the Company may change, suspend, or discontinue payments hereunder at any time or from time to time as the Company may decide" and that "the Company expressly reserves the right to terminate the trusts hereby created." (437 F.2d at 528, n.4) By contrast, the instant trust agreement gives the employers no such clear and unilateral authority. The responsibility for termination of the trust is put in the hands of the trustees. (Article VIII, Section 1) Though the agreement provides that "the Trust may be terminated when there is no longer in force an agreement between the Employers and the Union requiring any Employer Contributions to such Fund . . . ," this Court holds that the collective bargaining agreement made effective November 30, 1975 did not extinguish the employers' contractual obligation to their retired employees.

Those employees retired with justifiable reliance on the promise of a pension for life. Their pension rights vested upon retirement and were no longer a mere expectancy. *Compare Rothlein v. Armour and Company,* 377 F.Supp. 506, 509–513 (W.D.Pa.1974); *Craig v. Bemis Co., Inc., supra,* at 681. The employers may not rely on provisions designed to permit them to wind up or to discontinue their business as a basis for simply cutting these retired workers adrift in order to cut costs.

■ The doctrine of promissory estoppel has been well-stated in the *Restatement of Contracts, § 90* and adopted by several courts in this Circuit.

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*See, e. g., Intermar, Inc. v. Atlantic Richfield Co.,* 364 F.Supp. 82 (E.D.Pa.1973), and cases cited therein. Though the collective bargaining arena is not the usual context for application of this doctrine, the extraordinary circumstances of this case—particularly the conduct of the employers and the

trustees which they appointed—compel the Court to exercise its broad equitable powers to enforce the promise of a lifetime pension.

█ The employers' attempted disavowal of the retirees' vested right to a lifetime pension, as evidenced by the November 30, 1975 collective bargaining agreement, therefore constitutes a breach of contract within the meaning of 29 U.S.C. § 185. *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., supra*, 404 U.S. at 181, n.20, 92 S.Ct. 383. The Court notes that *Boase* specifically declined to rule on the estoppel issue, holding only that the evidence of reliance in that case was insufficient. (437 F.2d at 533, n.15) *Cf. Knoll v. Phoenix Steel Corp.*, 465 F.2d 1128, 1132 (3rd Cir. 1972).

When an employee retired after having fulfilled the conditions imposed by the governing agreements and plans for the receipt of a specified pension, he acquired a vested interest in a lifetime pension. That interest was not limited to a pension "for life" if and only if the pensioner died within the two-year term of the collective bargaining agreement in effect when he retired, as the defendant employers urge. Such a conclusion is foreign to any reasonable expectation of any of the parties, as revealed by the testimonial and documentary evidence presented in this case. Indeed the documentary evidence alone compels this conclusion. Nevertheless, at the request of the defendant employers the Court permitted them to call witnesses and took parol evidence on this issue. The Court finds from all the credible testimony, particularly that of McGinley, that the parties understood

the pensioners' benefits to be for life as well.

After seeing and hearing Seymour Hayman, who as "trustee" even on the day of his testimony, professed ignorance of every provision in every document which promised a lifetime pension, while attempting to limit the exposure of his corporate employer, the Court rejects his testimony as unworthy of belief.

### VI. Remedy

█ The Court has carefully considered the question of remedy. It is the conclusion of the Court that the multi-employer nature of the plan creates a joint and several liability on the part of each signatory employer. Each employer shall therefore be jointly and severally liable to provide the pension it promised to each retiree at the time he retired, under the collective bargaining agreement which it signed.[6]

Thus the defendant employers will be jointly and severally liable for such payments to secure the lifetime pensions of all covered employees who retired on or before November 30, 1975, with the following exceptions:

(a) the last retirement date for which liability shall be imposed upon Borden shall be December 28, 1968 (DB–1), the date it ceased New Jersey operations;

(b) the last retirement date for which liability shall be imposed upon Tuscan shall be November 7, 1975, the date of the arbitration award which entitled it to withdraw from the fund.

█ Defendant Johanna's motion to dismiss the complaint will be granted.[7]

---

6. Much has been made in brief and argument in this case of the claim of "impossibility" or "economic necessity," *i. e.*, that there is not enough money in the industry to pay the pensions of those who have worked for decades and have now retired. In fashioning its remedy, the Court has noted these contentions. The Court nevertheless rejects the suggestion that it is somehow "impossible" for the benefits which the employers effectively promised their employees to be provided them. It would be simply naive to believe that these additional costs will not be absorbed in the marketplace.

7. Counsel for the original plaintiffs, in a letter dated August 27, 1976 but received by the Court on September 7, 1976, seeks a further hearing on the original plaintiffs' allegation of a conspiracy between Alderney and Johanna "to engage in conduct harmful to the pension fund involved in the case *sub judice*." (Letter of Kent A. F. Weisert, Esquire, August 27, 1976.)

As counsel's letter concedes, all parties to this action were given ample notice and opportunity at the August 9, 1976 hearing to present all evidence relevant to the issue whether the

There is no evidence in the record to establish that Johanna was ever a party to a collective bargaining agreement requiring contributions to this fund. All outstanding prayers for relief in the receiver's petition and complaint (*i. e.*, items D, E and F of the petitions and their analogues in the complaint), except for that portion of item A and its analogue in the complaint which are resolved in his favor by this opinion, are hereby denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure. The Court notes that it views the entry of this Order as a final judgment, since the exact amount of employer liability is not now ascertainable because it will vary each month as the number of pensioners declines through attrition. Nevertheless, since the Court views an expeditious final disposition of this case to be in the interests of all, the Order will be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) to obviate any issue of finality. It will be the Order of the Court that the contributions required by this opinion be determined on the basis of quarterly actuarial projections by the Martin E. Segal Company. The employers shall be entitled to refund at the end of each quarter if the projection has proved excessive.

### ORDER

In accordance with the opinion of the Court filed this date,

It is on this 10th day of September, 1976,

ORDERED, that judgment be entered in favor of the receiver and against the defendant employers, jointly and severally, in such amounts as shall be necessary to secure the lifetime pensions of all employees covered by the Milk Industry-Local 680 Pension Fund who retired on or before November 30, 1975, PROVIDED that the last retirement date for which liability shall be imposed upon defendant Borden, Inc. shall be December 28, 1968; and further PROVIDED that the last retirement date for which liability shall be imposed upon defendant Tuscan Dairy Farms, Inc. shall be November 7, 1975; and it is further

ORDERED, that the funds required to be paid by this Order be paid quarterly, within fifteen (15) days after receipt by all parties and the Court of a quarterly actuarial projection of the monies required to secure the lifetime pensions provided for in this Order; and it is further

ORDERED, that the receiver arrange for the issuance of such quarterly actuarial projections, beginning thirty (30) days from the date hereof and continuing until further Order of the Court, by the Martin E. Segal Company.

It is hereby CERTIFIED, pursuant to 28 U.S.C. § 1292(b), that this Order and the accompanying opinion involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this Order may materially advance the ultimate termination of this litigation.

Appendix to follow.

rights of the pensioners had vested, and against which parties defendant, if any, whose rights were enforceable. The Court notes that Borden presented evidence tending to show that its liability was limited by its withdrawal from the New Jersey milk industry in 1968, and that counsel for Johanna and Alderney stated to the Court that he was prepared to go forward to rebut any allegations of conspiracy. Although plaintiffs' counsel was present at all hearings and proceedings in this matter, plaintiffs made no effort to produce any evidence to support their conspiracy claim, although during the hearing the Court plainly indicated it was prepared to entertain such evidence.

Furthermore, the Court views the original plaintiffs as without standing to raise any claim

of harm to the pension fund. These plaintiffs are all active employees of the contributing employers, and are therefore covered by the new pension plan effective November 30, 1975. Counsel for the original plaintiffs agreed soon after the new collective bargaining agreement and its new pension plan were put into effect that the new agreements "[have] protected their rights in the fund by putting together a new fund for them. I think we have protected the class of actives." (Tr. 2/24/76: 4) The Court views all claims against any party, including Johanna and Alderney, by the active employee plaintiffs to have been mooted by the last collective bargaining agreement. Accordingly, the Court will resolve the claims against Johanna and Alderney without further hearing.

# 659

APPENDIX A

UNITED STATES DISTRICT COURT

District of New Jersey

Chambers of
HERBERT J. STERN
Judge

United States Court House
NEWARK, N. J. 07101

March 24, 1976

Re: William J. Hurd, et al.
v. Edward Hutnick, et al.
Civil Action No. 74–899
LETTER–OPINION

Gentlemen:

This matter comes before the Court on its own motion, after several status conferences at which the issue of conflict of interest on the part of all or some of the trustees of the Local 680 Pension and Welfare Funds was raised.

The Court has carefully examined the complaint in this matter. The Court notes that the complaint does not, by its terms, purport to cover present pensioners in the putative plaintiff class, but rather limits itself to present employees. The Court need not and therefore does not now decide whether the present pensioners are before the Court through the plaintiffs, the defendant trustees, or otherwise. What is clear is that whether or not the present pensioners are represented in this action, the Funds themselves are before the Court as named and indispensable parties. Under the circumstances, therefore, no action of any kind can be taken with respect to this litigation, whether by way of settlement or otherwise, unless the Funds are properly represented.*

The proceedings before the Court have demonstrated, however, that at least half if not all of the present trustees of the Funds are in a conflict of interest. That conflict arises from each trustee's dual role as a fiduciary guardian of funds for the benefit

* For example, at the most recent status conference, on February 24, 1976, the parties raised the issue of settlement. The Court has no

of present pensioners, and as an employee or officer of either a contributing employer or a local union. Counsel for both sets of trustees, at least two employers, and plaintiffs have agreed on the record that at least half of the present trustees are in conflict. (Tr. 10/22/75: 56–59; Tr. 2/24/76: 72)

At the status conference of October 22, 1975, the Court had the following colloquy with counsel for the employer trustees:

THE COURT: Are you telling me that these trustees are in a conflict of interest?

MR. COHEN: There would be no way that you could have trustees designated by management and trustees designated by the union without their having the—the idea of having representatives from each side is that their interests are antithetical.

THE COURT: Not antithetical to the people whose money they are handling. They aren't supposed to be.

MR. COHEN: Well, that is oversimplifying it just a little bit.

THE COURT: Wait a minute, Mr. Cohen. You have been telling, maybe not overtly, but subtly—the message is getting across to me that these trustees are going to be worrying about not only whether there is enough money in the fund; they are going to be worrying about the employers they represent in terms of the bargaining as to how much additional money should be put in? Is that it?

MR. COHEN: They wouldn't be human if they didn't have that dual concern.

THE COURT: That is inimicable to the interests of the pensioners and workers, isn't it; that duality?

MR. COHEN: It need not be, your Honor.

THE COURT: Isn't it?

MR. COHEN: It need not be.

THE COURT: Could it be?

doubt that it would be necessary to hear from the Funds on that question, as it would be on every other significant issue or step in this suit.

MR. COHEN: It could be. If they were not the kind of men they were, it certainly could be.

THE COURT: You mean it depends on the quality of the clay we are talking about?

MR. COHEN: I think so, very much.

THE COURT: Aren't you compelling met to take action?

MR. COHEN: I'm saying to your Honor that I think that the particular trustees that we have here are fully aware of their primary responsibility. They are trying to discharge it in the best possible way in a very difficult situation, but they can't overlook the fact that the employers by whom they are employed, as it happens, may be subject to liability. They can't overlook the fact they have a collective bargaining agreement which is about to be renegotiated in the next month.

THE COURT: If they can't overlook those facts, doesn't their duty as fiduciary to the men require them to overlook that fact?

MR. COHEN: It certainly makes their principal—primary and sole responsibility as trustees that they discharge their duties in a way which is—

THE COURT: So the answer to my question is yes?

MR. COHEN: —to protect—

THE COURT: Is the answer to my question yes?

MR. COHEN: As to their primary responsibility.

THE COURT: Their only responsibility as trustees.

MR. COHEN: The answer is yes.

THE COURT: Then you are telling me that they cannot overlook things which they are required not to consider. Isn't that so?

MR. COHEN: I'm saying as representatives of dairies it would be very difficult for them not to consider the impact upon their employers, of course. Just as the union trustees would find it difficult not to consider the impact on the employees.

\* \* \* \* \* \*

THE COURT: . . .
You tell me that there are competing interests operating on their minds, are you?

MR. COHEN: I would be less than candid if I didn't acknowledge that, your Honor.

Tr. 10/22/75: 56–59

It was clear from the representations of counsel, and particularly from the statements of a representative of the Pension Benefit Guaranty Corporation who attended one of the status conferences, that the contributing employers could benefit by the Funds' failure to survive through January 1, 1978, when the Employee Retirement Income Security Act of 1974 (ERISA) would require the Corporation to take over the Funds. In such an event, however, ERISA might require the contributing employers to indemnify the Corporation for at least part of the Corporation's expenditures on behalf of the Funds. The interests of the present pensioners, of course, would be best served by the Fund's survival, even at reduced benefit levels, until the 1978 mandatory federal takeover date. Should the Funds fail before that date, however, the pensioners would be potentially unprotected and the employers therefore unthreatened. *See generally,* Tr. 10/22/75.

Counsel for one of the contributing employers candidly summarized the conflict problem with regard to the employer-appointed trustees:

THE COURT: Are the interests of the employers adverse to the interests of the pensioners at this point?

MR. MILMAN: Absolutely.

THE COURT: On that issue?

MR. MILMAN: Absolutely, your Honor. There can be no doubt about that. If I were to sit as a trustee on a pension plan and I'm an officer of a corporation who has a potential liability of $10 million effective January 1, 1978, and I sit as a trustee on a pension plan with the purpose to look out for the interests of

those pensioners, that has to be a conflict. My moral dictates might rule that I must weigh one over the other, but there has to be a conflict.

Tr. 2/24/76: 45–46.

Though a finding that only the employer trustees were in conflict would be sufficient, in the Court's view, to support the action the Court takes today, there is substantial question whether the Union-appointed trustees are in conflict as well. It appears from the representations of counsel at the February 24, 1976 status conference that the Union and almost all of the employers in the industry have entered into a new collective bargaining agreement. That agreement essentially dismantles the present Funds, replacing them with company rather than industry-wide private benefit plans for the benefit of present employees, but makes no provision for the protection of current pensioners. The latest actuarial analysis of the Funds' financial condition, submitted at the request of the Court, projects an extinction date of November, 1977. The report suggests that a 10% reduction of pension benefits would be necessary to ensure the Funds' viability through January, 1978. (Letter of Thomas W. Fitzgerald, Martin E. Segal Co., March 1, 1976)

The Court raised the issue of the Union trustees' conflict with their counsel:

THE COURT: I'll come to the union in a moment. Do you think that the union is entirely free of any conflict in this area?

MR. PARSONNET: I can't see any. They are deeply interested in the protection of the pensioners.

THE COURT: Put it this way. Are the present pensioners members of the union?

MR. PARSONNET: Yes. They are still regarded as members.

THE COURT: I didn't ask you whether they were regarded as members. I asked you whether they were, in fact, legally members. Do they pay dues?

MR. PARSONNET: No, they are not paying dues.

THE COURT: Are you under any duty to negotiate for them?

MR. PARSONNET: No.

THE COURT: But you are, I take it, under a duty to negotiate in good faith indeed as hard as you can for those who are your members and are present employees, is that correct?

MR. PARSONNET: That's correct.

THE COURT: And you are negotiating, vis-a-vis, that is, fact to face with the employers; is that correct?

MR. PARSONNET: That's correct.

THE COURT: Is it possible that in the sacrifice of the interests of those who are not even members and for whom there is no duty to negotiate, it might be that increased benefits could be obtained for those who are members and paying dues and on whose behalf there is a duty to negotiate?

MR. PARSONNET: May I call your Honor's attention to the fact that collective bargaining agreements for three years have been signed with all employers?

THE COURT: I cannot be blind to what happened in the lawsuit. The only ones who are wound up being protected are the present employees.

MR. PARSONNET: That's right.

THE COURT: And the union hasn't, in the course of the negotiation, negotiated at all as far as I can ascertain for the protection of the present pensioners.

MR. PARSONNET: They went on strike to protect them.

THE COURT: But the agreement which was the result of the strikes leaves them without protection; is that correct?

MR. PARSONNET: That's correct.

Tr. 2/24/76: 31–32.

The Court notes that plaintiffs have previously moved for the appointment of a

receiver to supervise the Funds. (Tr. 10/22/75: 60) The Court denied the motion after a hearing in November 10, 1975, upon the condition that the trustees file status reports of the Funds' condition every 60 days. Though the Court recognized on November 10, 1975 "that the situation is pregnant with possibilities of conflict," it declined to "act at this moment," based on the reporting system to which both counsel for the trustees agreed. (Tr. 11/10/75: 2)

The November hearing occurred, however, before the conclusion of the parties' new collective bargaining agreement. The Court has analyzed the results of those negotiations, and has determined that these additional facts require reevaluation of its denial of the motion for the appointment of a receiver. The Court now determines that there exists a clear and present conflict of interest on the part of both the employer and Union trustees with regard to the conduct of the instant litigation, which touches not only the rights of the present pensioners but also the very continued existence for the Funds themselves. The Court deems itself compelled to take action to ensure that the Funds, as parties to the suit, are adequately represented in this forum. In order to resolve the evident conflict of interest of the present trustees, the Court will grant plaintiffs' application for the appointment of a receiver.

An Order will issue appointing Bernard Hellring, Esquire, of Newark, New Jersey, as receiver of the Milk Industry-Local 680 Pension and Welfare Funds, until further Order of the Court. The receiver will have the authority to exercise all the powers of the trustees, insofar as they pertain to the proper protection of the Funds' interests in the instant litigation. In all other respects, the trustees shall remain in full authority, except to the extent that the exercise of their powers conflicts with the receiver's mandate. To that extent, the trustees' powers shall be delegated to and superseded by the receiver. In case of dispute with regard to the extent of the receiver's authority, either the receiver or any party may make appropriate application to this Court for resolution. The receiver will post a bond in the amount of $25,000.

Very truly yours,

(s) HERBERT J. STERN
United States District Judge

Orig. to Clerk, U. S. District Court

Newark, New Jersey

cc: Bernard Hellring, Esquire
1180 Raymond Boulevard
Newark, New Jersey 07102

### ORDER

This matter having come before the Court on its own motion, and the Court having reviewed the pleadings and the submissions of counsel, and the Court having heard the oral presentations of counsel on October 22, 1975, November 10, 1975, and February 24, 1976, and in accordance with the Court's Letter-Opinion filed this date, and good cause appearing therefor;

It is on this 24th day of March, 1976,

ORDERED, that Bernard Hellring, Esquire, of Newark, New Jersey, be, and he hereby is, appointed Receiver of the Milk Industry-Local 680 Pension and Welfare Funds, under the terms and conditions set out in the accompanying Letter-Opinion, until further order of the Court; and it is further

ORDERED, that Bernard Hellring, Esquire, do file with the Clerk of this Court a bond in the amount of $25,000 within ten (10) days hereof.